*489
 
 WISE, Judge.
 

 The appellant, Michael Jerome Lewis, was convicted of capital murder in connection with the death of Timothy John Kaye. The murder was made capital because it was committed “during a kidnapping in the first degree or an attempt thereof.” See § 13A-5-40(a)(l), Ala.Code 1975. After a sentencing hearing, the jury recommended, by a vote of 10-2, that Lewis be sentenced to death. The circuit court accepted the jury’s recommendation and sentenced Lewis to death.
 

 Lewis raises a number of issues for this Court’s review. However, our initial review of the record reveals that we must remand this case for additional action by the circuit court so that we may adequately address the merits of one of Lewis’s claims.
 

 Lewis contends on appeal that his due-process rights were violated when the prosecution used its peremptory challenges to remove African-Americans from the jury venire, thus violating the rule of
 
 Batson v. Kentucky,
 
 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).
 

 In
 
 Batson,
 
 the United States Supreme Court held that prospective African-American jurors could not be struck from an African-American defendant’s jury based solely on their race. The Supreme Court later extended its holding in
 
 Batson
 
 to apply to white defendants in
 
 Powers v. Ohio,
 
 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991); to civil cases in
 
 Edmonson v. Leesville Concrete Co.,
 
 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991); to defense counsel in criminal cases in
 
 Georgia v. McCollum,
 
 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992); and to gender-based peremptory challenges in
 
 J.E.B. v. Alabama,
 
 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994).
 

 The State contends that because no
 
 Batson
 
 objection was made below and that the error, if any, does not rise to plain error, this Court should reject Lewis’s claim.
 

 “Under the ‘plain error’ doctrine, as enunciated in rule 45A, [Ala.R.App.P.,] the Court of Criminal Appeals is required to search the record in a death penalty case and notice any error (ruling or omission) of the trial court, and to take appropriate action, ‘whenever such error has or probably has adversely affected the substantial right of the [defendant],’ in the same manner as if defendant’s counsel had preserved and raised such error for appellate review.”
 

 Ex parte Johnson,
 
 507 So.2d 1351, 1356 (Ala.1986). The plain-error analysis has been applied to death-penalty cases when counsel fails to make a
 
 Batson
 
 objection.
 
 Pace v. State,
 
 714 So.2d 316, 318 (Ala.Crim.App.1995), opinion after remand, 714 So.2d 320 (Ala.Crim.App.1996), reversed in part on other grounds, 714 So.2d 332 (Ala.1997). For plain error to exist in the
 
 Batson
 
 context, the record must raise an inference that the State engaged in “purposeful discrimination” in the exercise of its peremptory challenges. See
 
 Ex parte Watkins,
 
 509 So.2d 1074 (Ala.1987).
 

 A defendant makes out a prima facie case of discriminatory jury selection by “the totality of the relevant facts” surrounding a prosecutor’s conduct during the defendant’s trial.
 
 Batson,
 
 476 U.S. at 94, 106 S.Ct. 1712. “Once the defendant makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation for challenging” a targeted class of jurors. 476 U.S. at 97, 106 S.Ct. 1712. While there may be “ ‘any number of bases’ on which a prosecutor reasonably may believe that it is desirable to strike a juror who is not excusable for cause...., the prosecutor must give a
 
 *490
 
 ‘clear and reasonably specific’ explanation of his ‘legitimate reasons’ for exercising the challenges.” 476 U.S. at 98 n. 20, 106 S.Ct. 1712. It is then left to the trial court to determine whether the defendant has established “purposeful discrimination.” 476 U.S. at 98, 106 S.Ct. 1712.
 

 After Lewis’s appeal was taken under submission by this Court, the United States Supreme Court released two decisions addressing
 
 Batson claims
 
 —Miller-El
 
 v. Dretke,
 
 545 U.S. 231, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005), and
 
 Johnson v. California,
 
 545 U.S. 162, 125 S.Ct. 2410, 162 L.Ed.2d 129 (2005). In
 
 Miller-El,
 
 the prosecutors used peremptory strikes to remove 10 of 11 African-American jurors from Miller-El’s capital-murder trial. Miller-El objected, claiming that the strikes were racially based and could not be presumed to be legitimate, given the district attorney’s office history of excluding African-Americans from criminal juries. The trial court denied Miller-El’s request for a new jury, and his trial ended with a conviction and the imposition of the death sentence. While his appeal was pending, the Supreme Court released
 
 Batson v. Kentucky,
 
 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), holding that discrimination by a prosecutor on the basis of race in selecting a defendant’s jury violated the Fourteenth Amendment. On remand, the trial court found no showing that prospective African-American jurors were struck because of their race. Miller-El’s conviction was affirmed on appeal, and he sought federal habeas relief. The federal district court denied Miller-El relief, as did the United States Court of Appeals for the Fifth Circuit. After comparing similarly situated black and white jurors, the “shuffling” of the venire panel, and the disparate questioning of black and white jurors, the Supreme Court held that the state court’s factual findings as to nonpre-textual nature of the state’s race-neutral explanations for its use of peremptory challenges to excuse 10 of 11 African-American jurors were shown to be wrong by the requisite clear and convincing evidence, warranting the grant of federal ha-beas relief. 545 U.S. at 253, 125 S.Ct. at 2339-40.
 

 In
 
 Johnson,
 
 the prosecution used 3 of its 12 strikes to remove all 3 African-American jurors from Johnson’s jury— leaving him to be tried and convicted of second-degree murder by an all-white jury. The California Court of Appeals set aside the conviction, but the California Supreme Court reinstated Johnson’s conviction, holding that
 
 Batson
 
 permitted state courts to establish the standards used to evaluate the sufficiency of prima facie cases of purposeful discrimination in jury selection. The United States Supreme Court reversed, holding that California’s “more likely than not” standard was an incorrect standard by which to determine the sufficiency of a prima facie case of purposeful discrimination in jury selection. Given the California Supreme Court’s use of an incorrect standard, together with the fact that the prosecution removed all 3 African-American jurors from the venire panel, the Supreme Court held that this evidence was sufficient to establish a permissible inference of discrimination to establish a prima facie case of discrimination under
 
 Batson,
 
 shifting the burden to the state to provide an adequate explanation for the jurors’ exclusion by offering race-neutral reasons for its strikes. 545 U.S. at 239, 125 S.Ct. at 2418-19.
 

 The record here supplies an inference of discrimination on the part of the State. Initially, we note that the record is conflicting as to the number of prospective jurors from which Lewis’s jury was selected. The initial jury list of potential jurors consists of 189 individuals. (C. 115-132.)
 
 *491
 
 The strike list indicates that Lewis’s jury was struck from potential jurors no. 1-96. (C. 133-34.) Eighteen of the 96 jurors were African-American. However, what appears to be the actual strike list indicates that Lewis’s jury was struck from a pool of 53 jurors, and only 5 of those 53 were African-American. (C. 135.) The transcript of voir dire proceedings does not clarify this discrepancy. Although the transcript indicates that the roll of jurors was called and that all were present, the individual names were not recorded by the court reporter so that this Court could determine the exact number of prospective jurors present for voir dire. The record does, however, indicate that eight potential jurors were excused from further service, based on their responses during voir dire. Of the eight jurors excused, six were white and two were African-American, leaving five African-Americans.
 
 [1]
 
 After voir dire concluded, the prosecutor and defense counsel exercised 41 peremptory challenges to select Lewis’s jury. The State used its 21 strikes to strike 4 of the 5 remaining African-Americans from the ve-nire. Defense counsel struck no African-Americans. Lewis’s jury consisted of 11 white jurors and 1 African-American juror. Both alternate jurors were white.
 

 The State contends that no inference exists that the State engaged in purposeful discrimination because of the meaningful voir dire directed at the jurors as a whole. The record indicates that the African-American jurors as well as the white jurors responded to the questions posed during voir dire. Moreover, it appears that the African-American jurors and some of the white jurors who gave similar responses to the questions posed were struck, while other white jurors were not. Although the State may have race-neutral and nondiscriminatory reasons for its actions, we conclude that it is necessary to remand this case for a
 
 Batson
 
 hearing, in light of the many levels of judicial scrutiny that occur when a defendant is convicted of a capital offense and sentenced to death. As the Supreme Court noted in
 
 Miller-El:
 

 “[T]he rule in
 
 Batson
 
 provides an opportunity to the prosecutor to give the reason for striking the juror, and it requires the judge to assess the plausibility of that reason in light of all evidence with a bearing on it. 476 U.S., at 96-97, 106 S.Ct. 1712;
 
 Miller-El v. Cockrell,
 
 537 U.S. [322] at 339, 123 S.Ct. 1029 [ (2003) ]. It is true that peremptories are often the subjects of instinct,
 
 Batson v. Kentucky,
 
 476 U.S., at 106, 106 S.Ct. 1712 (Marshall, J., concurring), and it can sometimes be hard to say what the reason is. But when illegitimate grounds like race are in issue, a prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives. A
 
 Batson
 
 challenge does not call for a mere exercise in thinking up any rational basis. If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false. The Court of Appeals^ ] and the dissent’s substitution of a reason for eliminating [the prospective juror] does nothing to satisfy the prosecutors’ burden of stating a racially neutral explanation for their own actions.”
 

 545 U.S. at 252, 125 S.Ct. at 2331-32.
 

 Based on the foregoing, this case is remanded to the circuit court with directions that that court hold a
 
 Batson
 
 hearing. If
 
 *492
 
 the prosecution cannot provide race-neutral reasons for its use of peremptory challenges against African-American jurors, then Lewis shall be entitled to a new trial. See
 
 Ex parte Bankhead,
 
 585 So.2d 112 (Ala.1991);
 
 Pace v. State,
 
 714 So.2d 316 (Ala.Crim.App.1995), opinion after remand, 714 So.2d 320 (Ala.Crim.App.1996), reversed in part on other grounds, 714 So.2d 332 (Ala.1997);
 
 Guthrie v. State,
 
 616 So.2d 913 (Ala.Crim.App.1992).
 

 The circuit court shall take all necessary action to see that the circuit clerk makes due return to this Court at the earliest possible time and within 90 days of the release of this opinion. The return to remand shall include a transcript of the remand proceedings conducted by the circuit court and the circuit court’s specific findings of fact. Because it is necessary to remand this case, we pretermit discussion of Lewis’s remaining claims.
 

 REMANDED WITH DIRECTIONS.
 

 McMILLAN, P.J., and COBB, BASCHAB, and SHAW, JJ, concur.
 

 On Return to Remand
 

 AVISE, Judge.
 

 Michael Jerome Lewis was convicted of capital murder in connection with the death of Timothy John Kaye. The murder was made capital because it was committed “during a kidnapping in the first degree or an attempt thereof.” § 13A-5-40(a)(1), Ala.Code 1975. After a sentencing hearing, the jury recommended, by a vote of 10-2, that Lewis be sentenced to death. The circuit court accepted the jury’s recommendation and sentenced Lewis to death.
 

 One of the issues raised on appeal by Lewis was that his due-process rights were violated when the prosecution used its peremptory challenges to remove African-Americans from the jury venire, thus violating
 
 Batson v. Kentucky,
 
 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). On April 28, 2006, we remanded this case for additional action by the circuit court with regard to this claim.
 
 Lewis v. State,
 
 24 So.3d 480 (Ala.Crim.App.2006). The circuit court has complied with our instructions and on return to remand has submitted a transcript of the
 
 Batson
 
 hearing conducted by the circuit court, together with a copy of the circuit court’s specific findings of faet regarding Lewis’s
 
 Batson
 
 claim.
 

 Facts
 

 During the early morning hours of April 26, 1997, Lewis, James Anthony Free, April Hargedon, and Timothy John Kaye went to Lewis’s mobile home in Houston County. Free and Kaye became involved in an altercation, which resulted in Free’s beating Kaye in the head with his fist and a beer bottle. At some point, Lewis also became involved in the altercation. Free and Lewis then started arguing over who would shoot Kaye. The badly beaten Kaye was subsequently shot twice in the head. Kaye was placed in the back of his pick-up truck and taken across the state line into Holmes County, Florida. Lewis and Free then threw Kaye’s body from a bridge on Highway 2 into the Choctawhat-chee River. Lewis and Free later returned to Houston County, Alabama, in Kaye’s truck, drove the truck to a field alongside Sonny Mixon Road, and set it on fire.
 

 The evidence presented at trial tended to establish the following. On the afternoon of Friday, April 25, 1997, 38-year-old Timothy John Kaye left his parents’ home in Houston County, telling his parents that he planned to attend his daughter’s softball game. Later that evening, around 7:30 or 8:00 p.m., Sarah Kaye talked to her son again. Kaye asked his mother to tell his father that he would be by to pick him
 
 *493
 
 up around 6:00 a.m. on Saturday; the two men planned to go to a relative’s house in Mississippi to pick up some shrimp. Kaye failed to show up at his parents’ house the following morning, or for his daughter’s birthday party on Sunday, April 27; repeated attempts to contact him were unsuccessful.
 

 On April 27, Investigator Richard St. John of the Houston County Sheriffs Department was dispatched to a location on Sonny Mixon Road in Houston County. Upon arrival, Investigator St. John saw a burned pick-up truck in a field. The truck was towed to an impound lot in Dothan. After authorities determined that the vehicle was registered to Timothy John Kaye, the Houston County Sheriffs Department attempted to contact Kaye and left a message on Kaye’s answering machine regarding the discovery of the vehicle and its condition.
 

 On the morning of Tuesday, April 29, after repeated attempts to contact their son, the Kayes “broke into” Timothy Kaye’s home. Inside the house they found a birthday card for his daughter on the kitchen bar; the shirt and jogging shorts he wore to sleep in were laying on his bed. As best the Kayes were able to determine, all that was missing from their son’s closet were some “casual clothes” — stone-washed jeans, a sports shirt, and a pair of athletic shoes. When the Kayes listened to the messages on their son’s answering machine, they discovered a message from the Houston County Sheriffs Department asking that their son contact the sheriffs department. The Kayes then contacted the Houston County Sheriffs Department and subsequently filed a missing-person report on their son. Given the circumstances, an investigation was launched into Kaye’s disappearance.
 

 The investigation of Kaye’s disappearance led Houston County authorities to interview April Hargedon. During an April 30, 1997, interview, Hargedon told Investigator Donald Valenza and Commander Bill Land that on Friday, April 25, she accompanied Michael Lewis and Tony Free to the Corner Bar, located across the state line in Florida. The trio remained at the Corner Bar for several hours before returning to the Drifters’ Club in Dothan, Alabama. According to Hargedon, Free was related to the Ready family, owners of the Drifters’ Club. Inside the Drifters’ Club, Hargedon lost contact with Free. However, Hargedon saw Lewis make contact with Kaye, a longtime acquaintance of Lewis’s. At some point, Hargedon, Lewis, Kaye, and Kristy Hughes — Free’s girlfriend — decided to leave the Drifters’ Club and drive to the Players’ Club. The group left the Drifters’ Club, got into Lewis’s Ford Bronco sport-utility vehicle, and proceeded toward the Players’ Club. As Kristy Hughes was driving Lewis’s Bronco to the Players’ Club, the foursome was stopped by a Dothan police officer. After the officer determined that Hughes had an outstanding warrant, she was placed under arrest and taken into custody. Because Hargedon had no driver’s license and Lewis and Kaye had been drinking, the officer called a taxi for them. When the taxi arrived, Hargedon, Lewis, and Kaye returned to the Drifters’ Club. The trio went back inside the club for a while — -long enough for Kaye to consume another beer and Lewis to purchase a bottle of Canadian Mist brand whiskey. Sometime after midnight- — during the early morning hours of Saturday, April 26
 
 [1]
 
 — the trio left the Drifters’ Club in Kaye’s maroon truck and drove to Lewis’s mobile home.
 

 
 *494
 
 At the mobile home Lewis and Kaye sat around, drinking and talking. Hargedon stated that Lewis and Kaye seemed to be on good terms with each other, with one of them commenting that they had known each other for 20 years. It was not until Tony Free showed up that difficulties arose. According to Hargedon, Free exhibited “an attitude.” At some point after Free arrived, Lewis and Kaye went outside to engage in what appeared to Harge-don to be a brief, good-natured wrestling match. After several minutes, Lewis and Kaye stopped wrestling and began walking back inside. However, Free told Kaye that it was Free’s turn to wrestle. Kaye told Free that he did not want to wrestle again and continued walking toward the mobile home. At this point, Free hit Kaye in the back of the head with a beer bottle, causing Kaye to fall to the ground. Free fell to the ground with Kaye and began hitting him.
 

 While Lewis and Hargedon looked on, Free “jumped on” Kaye and pinned Kaye to the ground by sitting on his chest and/or abdominal area, leaving Kaye unable to defend himself as Free continued to hit him. According to Hargedon, the beating lasted 15-20 minutes, and throughout the beating Kaye kept asking Free, “Why are you doing this?” While Free continued to beat Kaye, Lewis went inside the mobile home and returned with a shotgun. Hargedon stated that Lewis returned with the shotgun, but that he made no effort to stop Free from beating Kaye. Instead, Hargedon stated that Lewis said “‘We got to finish this’ or something to that effect.” Not knowing what Lewis meant by this comment, Hargedon replied, “I don’t want nobody shooting nobody in front of me,” then took the shotgun from Lewis and put it back inside the mobile home. Because Hargedon had never seen a beating as vicious as the one Free was inflicting on Kaye, she became concerned for her own safety. As Kaye lay on the ground moaning, she heard first Free, and then Lewis say, “Let me shoot him,” referring to Kaye. In Hargedon’s words, “I just knew I needed to get out of there.”
 

 Hargedon stated that during the exchange between Lewis and Free over who would shoot Kaye, Lewis looked up and called out to a man across the road, “Look what I got.” According to Hargedon, the man declined, stating “he didn’t need no shit, he was in enough.” Hargedon stated that she took advantage of Lewis’s conversation with the unknown man to slip into the darkness and make her escape.
 

 The man whom Lewis called out to was Mike Harger, the husband of Lewis’s cousin Kandy Harger. The Hargers lived near Lewis; in fact, Lewis’s mobile home was directly across the road from the Hargers’ barn. On the morning of April 26, 1997, Kandy Harger awakened around 4:00 a.m. She left her house and went to the barn to check on the couple’s gamecocks, because the couple was preparing to go to a cockfight. While checking on the gamecocks, Harger heard the sounds of someone being hit and/or beaten; she also heard someone moaning. The sounds, which Harger described as “loud,” came from the direction of Lewis’s residence; she continued to hear these sounds as long as she was outside. After she went back inside her house, the telephone rang. When Harger answered the telephone, she discovered that it was her cousin, Mike Lewis. Lewis wanted Harger’s husband to come over to his residence. Harger told her husband what Lewis had said. A short while later, she returned to the barn. Harger’s husband subsequently drove the couple’s truck to the barn to load the gamecocks. Harger heard Lewis call out to her husband to “come over.” Harger stated she was fearful of what was going on at Lewis’s and that she did not want her husband
 
 *495
 
 to go over there. Her husband did not go over to Lewis’s residence. Instead, the couple loaded up their gamecocks and left. Although the sounds coming from Lewis’s yard upset Harger, she did not call emergency 911 or notify the authorities because her husband would not let her. When she and her husband left around 5:00 a.m., Harger could still hear moaning and groaning coming from the area of Lewis’s mobile home.
 

 Authorities obtained a search warrant for Lewis’s mobile home and the surrounding yard. On April 30, Dothan Police Officer Ray Owens executed the search warrant. During the search, Owens discovered spots of blood on two vehicles parked outside Lewis’s mobile home; a hair was embedded in one of the blood spots. Authorities also found a number of items lying on the ground, including a man’s Timex brand wristwatch with a torn band, a comb, a pack of cigarettes, several Canadian Mist brand whiskey bottles, and a number of beer bottles. Inside the mobile home, authorities discovered reddish stains that appeared to be “watered-down blood” around the bathroom sink near the back bedroom, a loaded 12-gauge shotgun, and a 5-gallon can containing what appeared to be kerosene. The wristwatch found outside Lewis’s mobile home was later identified by Sarah Kaye as belonging to her son, Tim Kaye.
 

 On May 4, 1997, Ray Darley was fishing in the Wildcat Cove area of the Chocta-whatchee River in Holmes County, Florida, when he discovered the body of a white male “up against a log jam” in the river. Darley contacted local authorities and reported finding the body. Later that day, Investigator Donald Valenza of the Houston County Sheriffs Department traveled to Holmes County to meet with Holmes County investigators concerning the recovery of the body from the Choctawhatchee River. Upon observing the body, Valenza noted that the body was clothed in a green t-shirt, jeans, and white athletic shoes. Authorities discovered a set of keys in the front pants pocket; those keys were released to Valenza to determine whether the keys fit any property belonging to Tim Kaye. It was later determined that the keys unlocked Tim Kaye’s truck, toolbox, and shed.
 

 The body found in the Choctawhatchee River was identified as Tim Kaye. Dr. Marie Hermann, a district medical examiner for the 14th District of Florida — encompassing Holmes County — performed the autopsy on Kaye’s body. Dr. Hermann’s autopsy revealed that Kaye had suffered multiple blunt-force injuries, including three blunt-force injuries on the back of Kaye’s head. Dr. Hermann also discovered two gunshot wounds on the back of Kaye’s head, which she determined came from a small caliber weapon; one of the gunshots traveled through the skull and exited the head. Dr. Hermann determined Kaye’s cause of death to be blunt-force trauma and/or two gunshot wounds to the head.
 

 On May 8, 1997, Investigators Mark Johnson and Richard St. John of the Houston County Sheriffs Department traveled to 914 Matthews Road, DeFuniak Springs, Florida, to interview Rodney Ray Alford. The residence, located in an area identified as the Darlington Community, was approximately 3 miles from where Kaye’s body was found and 50 miles from Houston County, Alabama. Alford told Johnson and St. John that Lewis had showed up at his son’s residence on Saturday, April 26, 1997, between 6:00 and 6:30 a.m. as he, his son, and Buddy Slay were preparing to go fishing. Lewis was driving a maroon truck and was accompanied by a black-haired man that Lewis called “James,”
 
 *496
 
 who Alford later identified as James Anthony Free.
 

 Alford observed that there was blood in the back of the truck as well as on the two men. Alford noticed that the blood on the two men appeared to be on their pants’ legs and shoes. When Lewis got out of the truck, he had a bottle of Canadian Mist brand whiskey in- his hand. Alford recalled Free and Lewis taking a hose and washing off their shoes. Alford stated that he did not ask Lewis and Free where the blood had come from and they did not volunteer any information about the source of the blood. Lewis and Free remained at the Alford residence for 45-60 minutes. While there, Alford observed them place a stick, a “car tag,” and some floor mats in a fire that was burning outside the residence. However, before the two men left, one of them removed the tag from the fire and threw it in a well. Lewis asked Alford to accompany them to the liquor store, but he declined. Before leaving, Lewis told Alford, “It’s family. Everything is all right.”
 

 Eddie Free testified that Lewis told him that he had shot Tim Kaye. According to Eddie, “they [Lewis and Free] shot him and they went to Florida and dumped him in the river and burned his truck.” Lewis reportedly stated that he killed Kaye because he was a “snitch” and informant for Houston County law-enforcement officials.
 

 Both Lewis and Free were indicted on charges of capital murder because the murder was committed during a kidnapping in the first degree or an attempt thereof. Free was tried first; he was convicted of capital murder and was sentenced to life imprisonment without the possibility of parole.
 
 [2]
 
 Free testified at length during Lewis’s trial, setting out the details surrounding Kaye’s murder and Lewis’s involvement in it.
 

 After both sides had rested and the circuit court had instructed the jury on the law applicable to Lewis’s case, the jury returned a verdict finding Lewis guilty of capital murder, as charged in the indictment.
 

 During the penalty phase of Lewis’s trial, the State resubmitted all the evidence it had introduced during the guilt phase. Lewis offered the testimony of two witnesses: his parents, Wade Lewis and Col-lene Williams. Wade Lewis testified that his son was born in September 1953. Lewis’s parents divorced in 1960, and both parents subsequently remarried. Lewis lived with his mother and stepfather until he was 16, when he went to live with his father. Wade Lewis described his son as a “good kid.” He stated that his son worked with him in his floor-covering business; Lewis installed various types of floor covering for his father. According to Wade Lewis, his son was a good and conscientious worker who got along well with customers. Lewis testified that “several years” before the instant trial, Lewis was involved in an automobile accident that resulted in a broken neck. According to his father, Lewis had a lengthy and “difficult” recovery, but eventually was able to go back to work.
 

 Collene Williams testified that following her divorce from Wade Lewis, she married Foy Ready. At the time of the marriage, Ms. Williams stated, Lewis was eight or nine years old. Ms. Williams described her son’s relationship with his stepfather as “not real good.” During the marriage, the family lived at the Parkway Motel. Ms. Williams testified that her son was
 
 *497
 
 required to perform certain chores before and after school. Ms. Williams stated that Ready drank heavily and that he had a violent temper. Ms. Williams testified that Ready was physically abusive to both her and her son. On several occasions, Ready was physically abusive to Lewis, whipping him so severely that Lewis was unable to go to school. Ms. Williams testified that Lewis also saw his stepfather physically abuse Lewis’s younger half-brother, Jimmy Ready. According to Ms. Williams, because of her husband’s abusive nature, Lewis’s grades fell, and he lost interest in school activities. Finally, when Lewis was 16, Ready’s behavior became so bad that Ms. Williams sent Lewis to live with his father. Ms. Williams believed that as the years passed, Ready’s abusive behavior resulted in Lewis having more difficulties interacting socially. Ms. Williams stated that Lewis had a close relationship with his half-brother, Jimmy Ready. According to Ms. Williams, Jimmy’s death in January 1997 greatly affected Lewis, causing a change in his behavior.
 

 During cross-examination, Ms. Williams admitted that despite his “difficult” relationship with Ready, Lewis continued to maintain contact with the Ready family, and patronized two of his stepfather’s businesses — the Drifters’ Club and the Players’ Club. Ms. Williams also stated that, during his lifetime, she had met the victim, Tim Kaye. According to Ms. Williams, her son and Kaye had known each other for approximately 20 years.
 

 After both sides rested, the circuit court instructed the jury on the law applicable to the penalty-phase proceeding. The jury returned a verdict recommending, by a vote of 10-2, that Lewis be sentenced to death.
 

 Standard of Review
 

 In every case in which the death penalty is imposed, this Court must review the record for any plain error, i.e., for any defect in the proceedings, whether or not the defect was brought to the attention of the trial court. Rule 45A, Ala.R.App.P., provides:
 

 “In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.”
 

 As this Court stated in
 
 Hall v. State,
 
 820 So.2d 113, 121-22 (Ala.Crim.App.1999), aff'd, 820 So.2d 152 (Ala.2001):
 

 “The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal. As the United States Supreme Court stated in
 
 United States v. Young,
 
 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the plain-error doctrine applies only if the error is ‘particularly egregious’ and if it ‘seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.’ See
 
 Ex parte Price,
 
 725 So.2d 1063 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999);
 
 Burgess v. State,
 
 723 So.2d 742 (Ala.Cr.App.1997), aff'd, 723 So.2d 770 (Ala.1998), cert. denied, 526 U.S. 1052, 119 S.Ct. 1360, 143 L.Ed.2d 521 (1999);
 
 Johnson v. State,
 
 620 So.2d 679, 701 (Ala.Cr.App.1992), rev’d on other grounds, 620 So.2d 709 (Ala.1993), on remand, 620 So.2d 714 (Ala.Cr.App.), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993).”
 

 Although Lewis’s failure to object at trial will not preclude this Court from reviewing an issue in this case, it will,
 
 *498
 
 nevertheless, weigh against any claim of prejudice he makes on appeal. See
 
 Dill v. State,
 
 600 So.2d 343 (Ala.Crim.App.1991), aff'd, 600 So.2d 372 (Ala.1992), cert. denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993).
 

 Guilt-Phase Issues
 
 I.
 

 Lewis argues that his due-process rights were violated when the prosecution used its peremptory challenges to remove African-Americans from the jury venire in violation of
 
 Batson v. Kentucky,
 
 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Specifically, Lewis argues that the record reflects that the prosecutor exercised disparate treatment when striking prospective jurors who were African-Americans and prospective jurors who were white. Lewis further argues that the reasons given by the State for using 4 of its 21 peremptory challenges to remove African-Americans from the jury were merely pre-textual, given that similarly situated white jurors were not struck.
 

 In
 
 Ex parte Branch,
 
 526 So.2d 609 (Ala.1987), the Alabama Supreme Court announced the standard a reviewing court should use when evaluating whether a
 
 Bat-son
 
 violation has occurred. The court stated:
 

 “The burden of persuasion is initially on the party alleging discriminatory use of peremptory challenges to establish a prima facie case of discrimination. In determining whether there is a prima facie case, the court is to consider ‘all relevant circumstances’ which could lead to an inference of discrimination.
 
 See Batson,
 
 476 U.S. at 93, 106 S.Ct. at 1721, citing
 
 Washington v. Davis,
 
 426 U.S. 229, 239-42, 96 S.Ct. 2040, 2047-48, 48 L.Ed.2d 597 (1976). The following are illustrative of the types of evidence that can be used to raise the inference of discrimination:
 

 “1. Evidence that the ‘jurors in question share[d] only this one characteristic — their membership in the group— and that in all other respects they [were] as heterogeneous as the community as a whole.’
 
 [People v.] Wheeler,
 
 22 Cal.3d [258], 280, 583 P.2d [748], 764, 148 Cal.Rptr. [890], 905. For instance ‘it may be significant that the persons challenged, although all black, include both men and women and are a variety of ages, occupations, and social or economic conditions,’
 
 Wheeler,
 
 22 Cal.3d at 280, 583 P.2d at 764, 148 Cal.Rptr. at 905, n. 27, indicating that race was the deciding factor.
 

 “2. A pattern of strikes against black jurors on the particular venire; e.g., 4 of 6 peremptory challenges were used to strike black jurors.
 
 Batson,
 
 476 U.S. at 97, 106 S.Ct. at 1723.
 

 “3. The past conduct of the state’s attorney in using peremptory challenges to strike all blacks from the jury venire.
 
 Swain [v. Alabama,
 
 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965) ].
 

 “4. The type and manner of the state’s attorney’s questions and statements during voir dire, including nothing more than desultory voir dire.
 
 Batson,
 
 476 U.S. at 97, 106 S.Ct. at 1723;
 
 Wheeler,
 
 22 Cal.3d at 281, 583 P.2d at 764, 148 Cal.Rptr. at 905.
 

 “5. The type and manner of questions directed to the challenged juror, including a lack of questions, or a lack of meaningful questions.
 
 Slappy v. State,
 
 503 So.2d 350, 355 (Fla.Dist.Ct.App.1987);
 
 People v.
 
 Turner; 42 Cal.3d 711, 726 P.2d 102, 230 Cal.Rptr. 656 (1986);
 
 People v. Wheeler,
 
 22 Cal.3d 258, 583 P.2d 748, 764, 148 Cal.Rptr. 890 (1978).
 

 “6. Disparate treatment of members of the jury venire with the same characteristics, or who answer a question in
 
 *499
 
 the same or similar manner; e.g., in
 
 Slappy,
 
 a black elementary school teacher was struck as being potentially too liberal because of his job, but a white elementary school teacher was not challenged.
 
 Slappy,
 
 [503] So.2d at 352 and 355.
 

 “7. Disparate examination of members of the venire; e.g., in
 
 Slappy,
 
 a question designed to provoke a certain response that is likely to disqualify a juror was asked to black jurors, but not to white jurors.
 
 Slappy,
 
 503 So.2d at 355.
 

 “8. Circumstantial evidence of intent may be proven by disparate impact where all or most of the challenges were used to strike blacks from the jury.
 
 Batson,
 
 476 U.S. at 93, 106 S.Ct. at 1721;
 
 Washington v. Davis,
 
 426 U.S. at 242, 96 S.Ct. at 2049.
 

 “9. The state used peremptory challenges to dismiss all or most black jurors. See
 
 Slappy,
 
 503 So.2d at 354,
 
 Turner,
 
 supra.”
 

 526 So.2d at 622-23. When reviewing a trial court’s ruling on a
 
 Batson
 
 motion, this court gives deference to the trial court’s ruling and will reverse that court’s decision only if it is clearly erroneous.
 
 Yancey v. State,
 
 813 So.2d 1, 3 (Ala.Crim.App.2001);
 
 Farrior v. State,
 
 728 So.2d 691 (Ala.Crim.App.1998);
 
 Merriweather v. State,
 
 629 So.2d 77 (Ala.Crim.App.1993);
 
 Nance v. State,
 
 598 So.2d 30 (Ala.Crim.App.1992); and
 
 Jackson v. State,
 
 594 So.2d 1289 (Ala.Crim.App.1991).
 

 As we previously noted, because Lewis made no
 
 Batson
 
 objection below, we review this claim under the plain-error standard; that is, whether the prosecutor’s actions were erroneous and whether “such error has or probably has adversely affected the substantial right of the appellant.” Rule 45A, Ala.R.App.P. This Court has applied a plain-error analysis in death-penalty cases when counsel failed to make a
 
 Batson
 
 objection. See, e.g.,
 
 Pace v. State,
 
 714 So.2d 316, 318 (Ala.Crim.App.1995), opinion after remand, 714 So.2d 320 (Ala.Crim.App.1996), reversed in part on other grounds, 714 So.2d 332 (Ala.1997). For plain error to exist in the
 
 Batson
 
 context, the record must raise an inference that the State engaged in “purposeful discrimination” in the exercise of its peremptory challenges. See
 
 Ex parte Watkins,
 
 509 So.2d 1074 (Ala.1987).
 

 Concluding that the record supplied an inference of discrimination on the part of the prosecution, we remanded Lewis’s case for additional findings regarding Lewis’s
 
 Batson
 
 claim. As we previously noted, the record contains conflicting information concerning the number of prospective jurors from which Lewis’s jury was selected. The initial jury list of potential jurors consisted of 189 individuals. (C. 115-32.) The strike list indicates that Lewis’s jury was struck from potential jurors no. 1-96. (C. 133-34.) Indeed, our review of the voir dire indicates that juror number 5 was one of the prospective jurors, as was juror number 90. Eighteen of the 96 jurors were African-American. However, what appears to be the actual strike list indicates that Lewis’s jury was struck from a pool of 53 jurors, and only 5 of those 53 were African-American. (C. 135.) The transcript of voir dire proceedings did not clarify this discrepancy, nor did the circuit court offer any explanation on remand regarding this discrepancy. Although the transcript indicated that the roll of jurors was called and that all were present, the individual names were not recorded by the court reporter so that this Court could determine the exact number of prospective jurors present for voir dire. The record indicated that eight potential jurors were excused from further service, based on their responses during voir dire. Of the
 
 *500
 
 eight jurors excused, six were white and two were African-American, leaving five African-Americans.
 
 [3]
 
 After voir dire concluded, the prosecutor and defense counsel exercised 41 peremptory challenges to select Lewis’s jury. The State used its 21 strikes to strike 4 of the 5 remaining African-Americans from the venire. Defense counsel struck no African-Americans. Lewis’s jury consisted of 11 white jurors and 1 African-American juror. Both alternate jurors were white.
 

 On remand, the court conducted an evi-dentiary hearing concerning the merits of Lewis’s
 
 Batson
 
 claim. During the hearing, the prosecution offered the following reasons for striking four African-American prospective jurors:
 

 Juror number 21:
 
 This juror was the State’s fourth strike. She was struck because she had served on a jury that acquitted a defendant of child molestation. (Supp. R. 13.)
 

 Juror number ⅛0:
 
 This juror was the State’s second strike. He was struck because he had served on a jury that acquitted a defendant of rape. (Supp. R. 18.)
 

 Juror number 57:
 
 This juror was the State’s sixteenth strike. He was struck because he had a misdemeanor conviction for writing a bad cheek. (Supp. R. 14.) The State offered a certified copy of a ease action summary sheet from Houston District Court indicating a September 2000 conviction for this individual. (Supp. C. 25.)
 

 Juror number 79:
 
 This juror was the State’s nineteenth strike. He was struck because he had a misdemeanor conviction for harassment, and an arrest for menacing. (Supp. R. 14.) The State offered certified copies of various court documents from Dothan Municipal Court regarding these offenses. (Supp. C. 26-30.)
 

 After a brief recess, defense counsel was given an opportunity to rebut the prosecutor’s reasons for striking these jurors. Defense counsel first submitted a legal memorandum setting out a list of cases from Houston County involving
 
 Batson
 
 objections, including five instances where this Court had reversed convictions from Houston Circuit Court based on
 
 Batson
 
 violations. Next, defense counsel addressed the prosecutor’s reasons for striking the four African-American jurors in Lewis’s case. Much of the discussion centered around the prosecutor’s reason for striking juror number 57. After confirming that the prosecutor struck juror number 57 because he had been convicted of writing a bad check, defense counsel offered certified copies of a case-action-summary sheet from Houston District Court and various other documents indicating that juror number 16, a white female, had been convicted of writing a bad check in November 2001. (Supp. C. 55-63.) Juror number 16 served on Lewis’s jury.
 

 The prosecutor stated that he was unaware that juror number 16 had been convicted of writing a bad check. The prosecutor maintained that, based on his records, juror number 16 had two convictions for what he termed minor traffic violations. The prosecutor indicated that he had not struck anyone who had been convicted of minor traffic violations; the only jurors struck because of traffic violations were those who had been convicted of driving while under the influence of drugs or alcohol. At the conclusion of the evidentiary hearing, the court took the
 
 *501
 
 case under advisement. The court indicated that it would accept briefs from the parties before entering its written order.
 

 Thereafter, the circuit court entered a written order making written findings of fact concerning the prosecutor’s reasons for striking the four African-American jurors. The court concluded that the prosecutor had given race-neutral reasons for striking the four jurors. The court concluded that the prosecutor had not engaged in disparate treatment because juror number 57 — a black male — was struck based on a misdemeanor conviction for writing a bad check and juror number 16 — a white female — was not, because the court was “convinced that the State did not know about [juror number 16’s] conviction.” (Supp. C.22.)
 

 The circuit court concluded that the prosecutor’s reasons for striking jurors number 21 and 40 were race-neutral. We agree. This Court has long held that the removal of an African-American venire-member based on prior jury service that resulted in an acquittal is a race-neutral reason. See, e.g.,
 
 Brown v. State,
 
 705 So.2d 871, 874 (Ala.Crim.App.1997);
 
 Sumlin v. State,
 
 615 So.2d 1801, 1802 (Ala.Crim.App.1993). Likewise, the removal of an African-American juror because of a prior criminal conviction is race-neutral. See, e.g.,
 
 Thomas v. State,
 
 611 So.2d 416, 417 (Ala.Crim.App.1992);
 
 Jackson v. State,
 
 549 So.2d 616, 681-19 (Ala.Crim.App.1989). Thus, the prosecutor’s removal of juror number 79 was for a race-neutral reason.
 

 Lewis’s challenge to the removal of juror number 57 is the most problematic. The prosecutor stated that juror number 57 was struck because he had a prior misdemeanor conviction for writing a bad check.
 
 [4]
 
 However, the prosecutor did not strike juror number 16 — a white female— despite the fact that she also had a prior misdemeanor conviction for writing a bad check. Thus, we must consider whether the prosecutor engaged in disparate treatment of these two veniremembers. As previously noted, striking a prospective juror based upon a prior conviction or previous criminal history is a race-neutral reason. However, this Court has made it clear that the failure to strike both white and African-American veniremembers because of prior criminal records constitutes evidence of disparate treatment. See
 
 Yancey v. State,
 
 813 So.2d at 7;
 
 Powell v. State,
 
 548 So.2d 590 (Ala.Crim.App.1988), aff'd, 548 So.2d 605 (Ala.1989).
 

 Here, the prosecutor explained that he failed to strike juror number 16 because he was unaware of her previous misdemeanor conviction. Had he known of juror number 16’s criminal record, the prosecutor stated, he would have stricken her as well. The Alabama Supreme Court discussed a similar situation in
 
 Ex parte Brown,
 
 686 So.2d 409, 420 (Ala.1996), cert. denied, 520 U.S. 1199, 117 S.Ct. 1558, 137 L.Ed.2d 705 (1997). The court noted:
 

 “A prosecutor can strike based on a mistaken belief, see
 
 Taylor v. State,
 
 666 So.2d 36, 42 (Ala.Cr.App.1994); therefore, it is logical that a prosecutor may also decide, based on a mistaken belief, not to strike a veniremember. Because the discrepancy in the way these two jurors were treated was adequately explained, we conclude that the strike of Juror 19 was race-neutral.”
 

 Accord
 
 Fletcher v. State,
 
 703 So.2d 432, 436 (Ala.Crim.App.1997); cf.
 
 McNair v. Campbell,
 
 416 F.3d 1291, 1311 (11th Cir.2005), cert. denied sub nom.,
 
 McNair v. Allen,
 
 547 U.S. 1073, 126 S.Ct. 1828, 164 L.Ed.2d 522 (2006) (“Although the prose
 
 *502
 
 cutor’s reason for striking McAllister was based on a belief that ultimately proved incorrect, this does not establish by clear and convincing evidence that the state court’s finding of fact was erroneous.”).
 

 The trial court found credible the prosecutor’s assertion that he had relied on a jury-information sheet that did not reflect juror number 16’s bad-check conviction. (State’s Exhibit 3, Supp. C. 81.) In light of the fact that a number of convictions from Houston County have been reversed as a result of
 
 Batson
 
 violations,
 
 [5]
 
 the trial court was certainly aware of the potential for abuse and, further, was in the best position to weigh the credibility of the prosecutor’s assertion that he was unaware of juror number 16’s bad-check conviction. State’s Exhibit 3 certainly lends credence to the trial court’s finding. Additionally, the State argues, and the record indicates, that the prosecutor also struck prospective juror W.C., a white female, who, like juror number 57, had a bad-check conviction.
 
 [6]
 
 This also suggests that the prosecutor struck prospective white jurors based on misdemeanor bad-check convictions and that he failed to strike juror number 16 because he was unaware of the full extent of her criminal history.
 

 Because the discrepancy in the way juror number 57 and juror number 16 were treated was adequately explained, we conclude that the strike of juror number 57 did not evidence disparate treatment. Based on the foregoing, we conclude that the trial court’s ruling was not clearly erroneous. Accordingly, no basis for reversal exists as to this claim.
 

 II.
 

 In Part X of his brief, Lewis argues that the State improperly injected victim-impact evidence and evidence of the victim’s good character during the guilt phase of his trial. Because Lewis did not raise this issue during trial, we review this claim for plain error.
 

 During his opening statement to the jury, the prosecutor commented on what he expected the evidence to show regarding the victim, Tim Kaye:
 

 “Tim was raised here in Houston County. The evidence would be that Tim was thirty-eight years old. He had been married. He had children. He had a job as a paint contractor. In fact, that Friday night before this Saturday morning, after midnight, he had worked. He had taken a check, cashed it on Saturday morning and he was to get up with his father to go to Mississippi to get some shrimp or something for his daughter’s birthday party that was to take place on Sunday. He had been down Friday night to watch his daughter play softball in Cottonwood.”
 

 (R. 161.) Additionally, during his opening statement, the prosecutor noted that he expected the victim’s mother, Sarah Kaye, to testify that her son had purchased a bracelet for his daughter and that a birthday card he had picked out for her was found at his residence.
 

 Contrary to Lewis’s claim, the prosecutor’s remarks did not constitute victim-impact evidence. As the United States Supreme Court held in
 
 Payne v. Tennessee,
 
 501 U.S. 808, 821, 111 S.Ct.
 
 *503
 
 2597, 115 L.Ed.2d 720 (1991), victim-impact statements typically “describe the effect of the crime on the victim and his family.” Accord
 
 Turner v. State,
 
 924 So.2d 737, 770 (Ala.Crim.App.2002). Nor were the aforementioned remarks improper references to the victim’s good character. Instead, these remarks were simply an explanation by the prosecutor of what he expected the evidence to show. Indeed, the State’s first two witnesses were Sarah Kaye, the victim’s mother, and Toni Kaye, the victim’s sister; these two witnesses testified to the instances referenced by the prosecutor in his opening statement concerning what he expected the evidence to show. Whatever is in evidence is subject to comment by the prosecutor, and he may argue every legitimate inference therefrom.
 
 Clark v. State,
 
 896 So.2d 584, 631-32 (Ala.Crim.App.2003).
 

 Accordingly, the prosecutor’s comments during his opening statement consisted of facts he expected to show about the victim. Although “ ‘[t]he comments did personalize the victim, ... they were brief enough that we cannot conclude that they injected prejudicial or irrelevant material into the sentencing decision.’ ”
 
 Kuenzel v. State,
 
 577 So.2d 474, 499 (Ala.Crim.App.1990) (quoting
 
 Brooks v. Kemp,
 
 762 F.2d 1383, 1409 (11th Cir.1985)).
 

 Alternatively, Lewis argues that the State “put on evidence to support its good character/victim impact argument” during the testimony of Sarah Kaye and Toni Kaye. We note that the complained-of testimony offered by these witnesses was offered for identification purposes. They testified regarding their relationship to the victim, Tim Kaye; Kaye’s job as a painter; the clothing Kaye was wearing when last seen; Kaye’s wristwatch; Kaye’s plans for Friday, April 25, 1997— the last day Mrs. Kaye saw her son alive — and his plans for the upcoming weekend. This testimony established a predicate for Mrs. Kaye and Toni Kaye’s identification of various State’s exhibits pertaining to the murder of Tim Kaye. As such, the facts to which they testified were properly developed during the course of Lewis’s trial and constituted nothing more than comments on the evidence. Thus, any comments made by the prosecutor during his opening statement regarding what he expected these witnesses to testify about did not constitute improper evidence regarding the victim’s good character, nor did these witnesses’ testimony constitute improper evidence regarding the victim’s good character. Because Lewis has failed to establish that the comments made by the prosecutor injected prejudicial or irrelevant material into the jury’s verdict, no basis for reversal exists.
 

 III.
 

 Lewis also argues that “the State improperly examined Hargedon.” Specifically, Lewis contends that the State should not have asked Hargedon what Free and Lewis “were going to do with Kaye,” because the question called for “speculation, state of mind, and violated Rule 704[, Ala. R.Evid.,] in that it violates the ultimate issue rule.” (Lewis’s brief, p. 35.) Because this claim was not raised below, we review it for plain error.
 

 “The question of admissibility of evidence is generally left to the discretion of the trial court, and the trial court’s determination on that question will not be reversed except upon a clear showing of abuse of discretion.”
 
 Ex parte Loggins,
 
 771 So.2d 1093, 1103 (Ala.2000). Rule 704, Ala.R.Evid., provides that “testimony in the form of an opinion or inference otherwise admissible is to be excluded if it embraces an ultimate issue to be decided by the trier of fact.” “An ultimate issue
 
 *504
 
 has been defined as the last question that must be determined by the jury. See
 
 Black’s Law Dictionary
 
 [1522 (6th ed. 1990)].”
 
 Tims v. State,
 
 711 So.2d 1118, 1125 (Ala.Crim.App.1997).
 

 As the State correctly points out, the ultimate issue in this case was whether Lewis participated in the intentional killing of Tim Kaye, and, if so, whether the murder occurred during the course of a first-degree kidnapping. As set out in our recitation of facts, Hargedon testified at length regarding the circumstances surrounding Lewis and Free’s beating of the victim, Tim Kaye. During her testimony, Hargedon told how Lewis came out of his mobile home carrying a shotgun. Harge-don recounted her fear and the need to “get out of there ... [b]ecause they were fighting and there were guns.” (R. 239.) Hargedon was asked: “What were [Lewis and Free] going to do to Tim Kaye?” to which she responded: “I guess finish it. I don’t know.” (R. 239.)
 

 We do not consider Hargedon’s testimony to constitute a comment on the ultimate issue of fact. Hargedon’s testimony was nothing more than a lay opinion based on her personal knowledge and observations of what happened that night. Rule 701, Ala.R.Evid., provides:
 

 “If the witness is not testifying as an expert, the witness’s testimony in the form of an opinion or inference is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness’s testimony or the determination of a fact in issue.”
 

 Hargedon’s opinion was rationally based on her perception of the events that occurred that night and her knowledge of the circumstances surrounding Kaye’s murder. As such, it was helpful to a clear understanding of her testimony. See, e.g.,
 
 Gavin v. State,
 
 891 So.2d 907, 969-70 (Ala.Crim.App.2003), cert. denied, 891 So.2d 998 (Ala.2004). We do not consider Har-gedon’s testimony an opinion as to Lewis’s guilt or as to how his case should be resolved. Moreover, we find it unlikely that any of the jurors would have substituted Hargedon’s opinion for their own judgment. Thus, Hargedon’s testimony did not violate the ultimate issue rule.
 

 Even if we were to conclude that the prosecutor erred in eliciting this testimony from Hargedon, we would not find reversible error, given that her testimony was merely cumulative of other evidence presented during Lewis’s trial. See
 
 Simmons v. State,
 
 797 So.2d 1134, 1158 (Ala.Crim.App.1999), cert. denied, 797 So.2d 1186 (Ala.2001). Thus, admission of this testimony would have been harmless beyond a reasonable doubt. See
 
 Chapman v. California,
 
 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Accordingly, there was no plain error in the admission of Hargedon’s testimony.
 

 IV.
 

 In Part VI of his brief, Lewis argues that the trial court erred when, over his objection, it allowed the State to examine State’s witness Rodney Ray Alford, using a statement Alford had given to a Houston County Sheriffs Department investigator. Specifically, Lewis contends that the State should not have been allowed to question Alford concerning his earlier statement until it had demonstrated that Alford needed to have his memory refreshed.
 

 Our examination of the record indicates that during the State’s examination of Alford, he testified about his encounter with Free and Lewis on the morning of Saturday, April 26. Alford testified that sometime between 6:00 and 7:00 a.m. the pair drove up to his son’s house near Darling-ton, Florida, in a maroon or dark red pickup truck. Alford observed the men wash
 
 *505
 
 blood out of the back of the truck and off their pants and shoes. At some point during Alford’s direct examination, the prosecutor asked him if he recalled making a statement to investigators with the Houston County Sheriffs Department. Alford was shown the statement and asked if he recalled telling the investigators about a conversation between Lewis and Free about how much fun they had had, or something to that effect. Alford responded that he recalled one of the men saying that “they had more fun that night ... than they ever had.” (R. 384.) When asked if he recalled telling the Houston County investigators that Lewis made the statement, Alford stated that he recalled one of them making the statement, but he could not swear as to which one had actually made it. When questioned further, Alford stated that he might have attributed the statement to Lewis, but that it had been a while since he had given the statement to Houston County authorities.
 

 Alabama law provides that
 

 “[i]n order for a writing to be usable for refreshing a witness’ memory under the doctrine of present recollection revived, it must appear that the witness possesses a personal knowledge of the matter recorded in the writing. It is left within the considerable discretion of the trial judge to decide whether the witness does indeed possess a present recollection that can be refreshed.”
 

 1 Charles W. Gamble,
 
 McElroy’s Alabama Evidence
 
 § 116.02(1) (5th ed. 1996) (footnotes omitted).
 

 Here, Alford showed by his testimony that he had personal knowledge of the events recorded in the statement to Houston County authorities. Moreover, although Lewis contends that it was improper for the prosecutor to question Alford about the statement without Alford first showing that he needed to have his memory refreshed, this contention is not supported by Alabama law. “A witness may refer to a writing for the purpose of refreshing recollection without first, as a condition precedent, having shown that it is necessary for the witness’ recollection to be refreshed.”
 
 McElroy’s Alabama Evidence,
 
 supra at § 116.02(6) (footnotes omitted). See also
 
 Ex parte Scott,
 
 728 So.2d 172, 185 (Ala.1998). Accordingly, the trial court did not err in allowing the prosecutor to show Alford his earlier statement in an effort to refresh his memory.
 

 Moreover, despite the prosecutor’s attempt to refresh Alford’s recollection with his previous statement, Alford was still unable to state which one of the men—Lewis or Free—had made the statement. Thus, because Alford was unable to attribute the remark to Lewis, no prejudice resulted to Lewis. Even assuming that allowing the prosecutor to read from Alford’s statement was error, such error was harmless, because the testimony elicited by the prosecutor following his reference to Alford’s statement was impeached by Lewis’s defense counsel with his presentation of a conflicting statement given by Alford during another hearing. Because any possible prejudice was averted, any potential error was rendered harmless beyond a reasonable doubt. See, e.g.,
 
 Ex parte Baker,
 
 906 So.2d 277, 284 (Ala.2004) (“the harmless error rule excuses the error of admitting inadmissible evidence only because the evidence was so innocuous or cumulative that it could not have contributed substantially to the adverse verdict”). No basis for reversal exists as to this claim.
 

 V.
 

 In Part I of his brief, Lewis argues that the trial court erred by allowing his codefendant, James Anthony Free, to testify that he had been convicted of the
 
 *506
 
 capital murder of Tim Kaye. Further, Lewis argues, this error was compounded by the trial court’s failure to give a limiting instruction to the jury. Because Lewis did not object when this testimony was elicited from Lewis and because he failed to request a curative instruction after the evidence was admitted, we review this claim pursuant to the plain-error doctrine. Rule 45A, Ala.R.App.P.
 

 Generally, evidence and argument regarding the outcome of a codefen-dant’s case are improper in the trial of a fellow accused. In
 
 Tomlin v. State,
 
 591 So.2d 550, 554 (Ala.Crim.App.1991), this Court stated:
 

 “In 1899, the United States Supreme Court held that evidence of a codefen-dant’s conviction was not admissible in the trial of his fellow accused. See
 
 Kirby v. United States,
 
 174 U.S. 47, 19 S.Ct. 574, 43 L.Ed. 890 (1899). This is still the prevailing view. See Annot., 48 A.L.R.2d 1016, and cases cited therein.
 

 “ ‘Where two or more persons are jointly indicted for the same criminal offense which is in its nature several, or are separately indicted for such offense or for separate offenses growing out of the same circumstances, and are tried separately, the fact that one defendant has pleaded guilty or has been convicted is, as a general rule, inadmissible as against the other, since competent and satisfactory evidence against one person charged with an offense is not necessarily so against another person charged with the same offense, and since each person charged with the commission of an offense must be tried upon evidence legally tending to show his guilt or innocence.’
 

 “48 A.L.R.2d at 1017.”
 

 However, we went on to note that “[t]here are exceptions” to this general rule, the first being “ ‘[w]here the common-law distinction between a principal and an abettor has not been abolished, the conviction or plea of guilty of a principal is admissible against one being tried separately as an abettor, since the principal’s guilt is a prerequisite to prove the guilt of the accused.’” 591 So.2d at 554 (quoting 48 A.L.R.2d at 1017, n. 1). Additionally, “evidence of a codefendant’s conviction may be admissible for purposes of impeachment when the codefendant testifies at trial. However, the court should give the jury a limiting or cautionary instruction concerning the use of the conviction.” 591 So.2d at 554 (citing
 
 United States v. Austin,
 
 786 F.2d 986 (10th Cir.1986), and
 
 Stokes v. State,
 
 462 So.2d 964 (Ala.Crim.App.1984)). In
 
 Tomlin,
 
 this Court held that because evidence that Tomlin’s codefendant had already been convicted and sentenced to death came in through the testimony of a law-enforcement official, the codefendant did not testify, and the trial court’s limiting instructions were inadequate, neither of the recognized exceptions applied. Accordingly, reversal of Tomlin’s conviction and death sentence was mandated. 591 So.2d at 554-56.
 

 Under current Alabama law, there is no distinction between principals and accessories. See, e.g.,
 
 Faircloth v. State,
 
 471 So.2d 485, 489 (Ala.Crim.App.1984), aff'd, 471 So.2d 493 (Ala.1985) (“Alabama Code § 13A-2-23 (1975) continues the long recognized abolition of the distinction between principals and accessories in Alabama.”). Therefore, the first exception recognized in
 
 Tomlin
 
 is inapplicable. However, this Court has upheld convictions where evidence of a codefendant’s conviction was admitted for purposes of impeachment when the codefendant testified at trial. Indeed, in
 
 Saffold v. State,
 
 494 So.2d 164, 170-71 (Ala.Crim.App.1986), this Court recognized that the admission of a codefen-
 
 *507
 
 dant’s conviction is not error if its use is limited to a proper evidentiary purpose, such as to impeach trial testimony or to reflect on the witness’s credibility. In
 
 Sqf-fold,
 
 the codefendant testified. We held that reversal was not warranted because evidence of the codefendant’s guilty-plea conviction could be used to impeach his trial testimony or to reflect on his credibility. 494 So.2d at 170.
 

 After reviewing the record in this case, we conclude that the facts in this case more closely resemble those in
 
 Saffold
 
 than those in
 
 Tomlin.
 
 Here, the State called Lewis’s codefendant, James Anthony Free, to testify against Lewis. Based on defense counsel’s opening statement, the State was well aware that Lewis would be attacking Free’s credibility. Accordingly, at the outset of Free’s testimony, the prosecutor asked Free whether he had been convicted of capital murder in connection with Kaye’s death, and whether he had been offered “any deals” in exchange for his testimony. Free acknowledged his capital-murder conviction and stated that he had been promised nothing in exchange for his testimony. The prosecutor did not dwell on these details. Rather, he simply got these facts out of the way and proceeded to establish the facts surrounding Kaye’s kidnapping and murder.
 

 During his cross-examination of Free, defense counsel used the fact that Free had already been convicted of capital murder in conjunction with Kaye’s death to vigorously attack Free’s credibility. Defense counsel questioned Free at length concerning his participation in the vicious beating and subsequent shooting of Kaye, in an attempt to establish Free’s greater culpability in the crime. Likewise, defense counsel questioned Free at length concerning any hopes he had for a reduced sentence, in an attempt to persuade the jury that Free’s testimony was “shaded” to say what the prosecutor wanted to hear. Given these circumstances, we do not find that the prosecutor’s brief questions to Free concerning his conviction constitute error.
 
 [7]
 

 Further, we do not consider the trial court’s failure to give a special limiting instruction regarding Free’s testimony error, given that defense counsel neither objected to Free’s testimony concerning his conviction nor requested a limiting instruction.
 

 “ ‘A cautionary instruction is generally sufficient to dispel any prejudice that arises from informing the jury of a code-fendant’s plea of guilty.
 
 United States v. White,
 
 589 F.2d 1283, 1290, n. 14 (5th Cir.1979). However, while a curative statement may be the preferred practice and is an important element in insuring the jury’s impartiality, it is but one of the many factors to consider on review. The prevailing inquiry is one of fairness and to this end, jury instructions are important only insofar as they protect the substantive rights of the accused.
 
 United States v. King,
 
 505 F.2d at 607.
 

 [[Image here]]
 

 “ ‘Ordinarily, when the jury learns of a codefendant’s guilt for the same or similar offenses, and the defense counsel does not request that a curative instruction be given, the failure of the trial judge to give one will not require reversal.
 
 United States v. Beasley,
 
 519 F.2d
 
 *508
 
 [233,] 240 [ (5th Cir.1975) ]. Only in those rare situations in which other “aggravating circumstances” have exacerbated the prejudice will the failure to give cautionary instructions result in plain and reversible error. See, e.g.,
 
 United States v. Harrell,
 
 436 F.2d 606, 617 (5th Cir.1969 [1970]).’ ”
 

 Saffold,
 
 494 So.2d at 170-71 (quoting
 
 United States v. DeLucca,
 
 630 F.2d 294, 298 (5th Cir.1980)).
 

 Although the trial court did not give a specific limiting instruction regarding the jury’s consideration of Free’s conviction, it was nevertheless fully apprised as to the proper evaluation of witness testimony, particularly the testimony of “interested witnesses” such as James Anthony Free. Jurors are presumed to follow the trial court’s instructions. See
 
 Irvin v. State,
 
 940 So.2d 331, 352 (Ala.Crim.App.2005) (citing
 
 Taylor v. State,
 
 666 So.2d 36, 70 (Ala.Crim.App.), on return to remand, 666 So.2d 71 (Ala.Crim.App.1994), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996)). No basis for reversal exists regarding this claim.
 

 VI.
 

 Lewis, who categorizes State’s witnesses James Anthony Free and Eddie Free as “snitches,” argues that the Frees “had constitutionally unreliable testimony.” (Lewis’s brief, p. 40.) Therefore, Lewis argues, the State should not have been allowed to present the testimony of these two witnesses without first showing that “the testimony can withstand a reliability test.” This claim was not raised below; therefore, we review it for plain error.
 

 Rule 601, Ala.R.Evid., provides that “[e]very person is competent to be a witness except as otherwise provided in these rules.” As the Advisory Committee’s Notes to Rule 601 recognize:
 

 “[Rule 601] acknowledges the prevailing sentiment that very few persons are incapable of giving testimony useful to the trier of fact and that historic grounds of incompetency — mental incapacity, conviction, etc. — should go to the credibility of the witness and the weight the trier of fact gives to the witness’s testimony.”
 

 In effect, Lewis asks that this Court ignore the general rule of competency set out in Rule 601. Instead, he contends, the trial court should make an initial credibility decision as to a witness’s competency to testify, thus depriving the jury of its traditional role in determining witness credibility. Lewis cites no Alabama law, nor can we find any, requiring that, absent some special circumstance, a witness must pass a reliability test before being allowed to testify. Indeed, the cases cited by Lewis all involve special circumstances requiring the trial court to determine the reliability of certain witnesses or evidence before the witness or evidence is presented to the jury.
 
 [8]
 

 
 *509
 
 We see no reason to limit the liberal application of Rule 601. Nor do we see any reason to limit the jury’s traditional role in determining witness credibility. See, e.g.,
 
 Cumbo v. State,
 
 368 So.2d 871, 875-76 (Ala.Crim.App.1978), cert. denied, 368 So.2d 877 (Ala.1979) (recognizing that the jury has the responsibility of assessing the credibility of each witness and weighing all the evidence, whether direct or circumstantial, as they viewed it). Whether the Frees were “snitches” who testified in exchange “for a deal or in hope of receiving a deal” was a question for the jury to determine, given that both men denied that they had been offered any deals or promises in exchange for their testimony against Lems. The jury was fully apprised of each man’s criminal history, including James Anthony Free’s role as Lewis’s accomplice. Moreover, the trial court instructed the jury on the proper evaluation of witness testimony, particularly the testimony of “interested witnesses,” specifically, James Anthony Free and Eddie Free. Jurors are presumed to follow the trial court’s instructions. See
 
 Irvin v. State,
 
 940 So.2d at 352 (citing
 
 Taylor v. State,
 
 666 So.2d at 70). Accordingly, we find no error, plain or otherwise, regarding this claim.
 

 VII.
 

 During the cross-examination of Dr. Marie Herrmann, the medical examiner who performed the autopsy on Kaye, Lewis’s defense counsel asked Dr. Herr-mann whether she had requested any type of blood-alcohol analysis. Dr. Herr-mann stated that she did, in fact, request a blood-alcohol analysis. When counsel attempted to have the contents of the toxicology report admitted as a business record, the trial court sustained the prosecutor’s hearsay objection.
 
 [9]
 

 Lewis now argues that the trial court erred in refusing to allow the toxicology report into evidence. Specifically, Lewis contends that the toxicology report — establishing that the victim had a blood-alcohol content of 0.19% — was crucial to his defense for three reasons: (1) because it supported a defense theory that the cause of death was the combination of concussion suffered as a result of the blows administered by Lewis’s codefen-dant, Free, and Kaye’s intoxication; (2) because it supplied further evidence that the victim and Lewis were “extremely intoxicated,” thus negating the capital-murder charge during the guilt phase; and (3) because it “would have added further evidence that [Lewis’s] intoxication was an extremely strong mitigator.” (Lewis’s brief, p. 32.) Lewis argues that this report should have been admitted into evidence pursuant to either the business-record exception or the public-record exception to the hearsay rule — Rule 803, Ala.R.Evid.
 

 In
 
 Mayo v. City of Rainbow City,
 
 642 So.2d 524 (Ala.Crim.App.1994), the defendant, Mayo, was convicted of cruelty to animals and criminal possession of a noxious substance. On appeal, Mayo argued that the trial court erred in admitting into evidence the copy of a report, sent from a veterinary laboratory to a veterinarian, that was not admissible under the business-record exception to the hearsay rule. This Court agreed, stating:
 

 “The admission of the report into evidence was error. Although it might have been authenticated as a business record admissible under Ala.Code 1975,
 
 *510
 
 § 12-21-43, it could not have been authenticated by Dr. Baxter’s testimony.
 

 “ ‘Testimony by any witness, frequently the custodian of the record, that the document now exhibited to him is a record of the business;
 
 that he knows the method (i.e., the standard operating procedure) used in the business of making records of the kind now exhibited to him;
 
 and that it was the regular practice of the business to make records of such kind and to make them at the time of the event recorded or within such specified period thereafter as could be found by the trier of fact to be reasonable, is a sufficient authentication of the record to require its admittance in evidence.’
 

 “C. Gamble,
 
 McElroy’s Alabama Evidence
 
 § 254.01(3) at 679 (4th ed. 1991) (emphasis added).
 

 “The lab report, authored by a third party and sent to Dr. Baxter, was obviously not made in the regular course of Dr. Baxter’s business. The report may have been retained, and even relied on, by Dr. Baxter in the regular course of his business, but neither of those occurrences is sufficient to make the report Dr. Baxter’s business record. See
 
 Ex parte Frith,
 
 526 So.2d 880, 882-84 (Ala.1987) (letter written by Bryce Hospital psychiatrist and sent to prison psychiatric social worker could not be authenticated by social worker as a business record of the social worker).
 

 “Dr. Baxter was simply not a ‘person in a position to attest to the authenticity of the lab report. See
 
 Theriot v. Bay Drilling Corp.,
 
 783 F.2d 527, 533 (5th Cir.1986) (construing Fed.R.Evid. 803(6)). Because the admission of the lab report was error, the appellant is entitled to a new trial.”
 

 642 So.2d at 527.
 

 Citing this Court’s decision in
 
 Perkins v. State,
 
 897 So.2d 457 (Ala.Crim.App.2004), Lewis argues that the toxicology report was, in fact, admissible. Lewis’s reliance on
 
 Perkins
 
 is misplaced, however, because
 
 Perkins
 
 is factually distinguishable from the instant case. In
 
 Perkins,
 
 the State sought to admit an autopsy report prepared by a medical examiner who had since retired from the Department of Forensic Sciences and was unavailable to testify. Despite this, however, the State was able to authenticate the autopsy report through the testimony of two other witnesses then employed by the Department of Forensic Sciences: (1) the retired medical examiner’s assistant, who had been present when the autopsy was performed and who testified regarding the actions undertaken by the retired medical examiner; and (2) another medical examiner, who testified that the autopsy report was an established business record kept in the ordinary course of business by the Department of Forensic Sciences. That medical examiner also testified that he had reviewed the autopsy and was in agreement with the findings contained in the report. Under these circumstances, we held that admission of the autopsy report did not violate Perkins’s rights under the Confrontation Clause to the Sixth Amendment to the United States Constitution. 897 So.2d at 463-65.
 

 Based on
 
 Perkins,
 
 the toxicology report might have been able to be authenticated as a business record admissible under Rule 803(6), Ala.R.Evid., had Lewis met the foundation requirements of Rule 803(6). Because he did not, the trial court properly excluded this report from evidence. See
 
 Mayo,
 
 supra. In any event, we fail to see how exclusion of this report prejudiced Lewis’s defense given that Lewis was still able to get Dr. Herrmann to testify that the victim’s intoxication might have exacerbated the effect of the blows to his head
 
 *511
 
 by Free and Lewis, allowing Lewis to argue this defense theory. However, we fail to see how the victim’s intoxication was relevant to prove Lewis’s own intoxication, particularly to support Lewis’s claim that he lacked the intent to kill the victim or to mitigate against imposition of the death penalty. Accordingly, no basis for reversal exists as to this claim.
 

 VIII.
 

 Lewis argues that there was insufficient evidence upon which to sustain his convictions for the capital offenses of murdering Kaye during the commission of first-degree kidnapping. Lewis maintains that there was no corroborative evidence to support that he kidnapped Kaye or that he had a particularized intent to kill Kaye. (Lewis’s brief, pp. 24-29.)
 

 “ ‘ “In determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution.” ’
 
 Ballenger v. State,
 
 720 So.2d 1033, 1034 (Ala.Crim.App.1998), quoting
 
 Faircloth v. State,
 
 471 So.2d 485, 488 (Ala.Crim.App.1984), aff'd, 471 So.2d 493 (Ala.1985). ‘ “The test used in determining the sufficiency of evidence to sustain a conviction is whether, viewing the evidence in the light most favorable to the prosecution, a rational finder of fact could have found the defendant guilty beyond a reasonable doubt.” ’
 
 Nunn v. State,
 
 697 So.2d 497, 498 (Ala.Crim.App.1997), quoting
 
 O’Neal v. State,
 
 602 So.2d 462, 464 (Ala.Crim.App.1992). ‘“When there is legal evidence from which the jury could, by fair inference, find the defendant guilty, the trial court should submit [the ease] to the jury, and, in such a case, this court will not disturb the trial court’s decision.” ’
 
 Farrior v. State,
 
 728 So.2d 691, 696 (Ala.Crim.App.1998), quoting
 
 Ward v. State,
 
 557 So.2d 848, 850 (Ala.Crim.App.1990). ‘The role of appellate courts is not to say what the facts are. Our role ... is to judge whether the evidence is
 
 legally
 
 sufficient to allow submission of an issue for decision [by] the jury.’
 
 Ex parte Bankston,
 
 358 So.2d 1040, 1042 (Ala.1978).
 

 “ ‘The trial court’s denial of a motion for judgment of acquittal must be reviewed by determining whether there was legal evidence before the jury at the time the motion was made from which the jury by fair inference could find the defendant guilty.
 
 Thomas v. State,
 
 363 So.2d 1020 (Ala.Cr.App.1978). In applying this standard, this court will determine only if legal evidence was presented from which the jury could have found the defendant guilty beyond a reasonable doubt.
 
 Willis v. State,
 
 447 So.2d 199 (Ala.Cr.App.1983). When the evidence raises questions of fact for the jury and such evidence, if believed, is sufficient to sustain a conviction, the denial of a motion for judgment of acquittal does not constitute error.
 
 McConnell v. State,
 
 429 So.2d 662 (Ala.Cr.App.1983).”
 

 Gavin v. State,
 
 891 So.2d 907, 974 (Ala.Crim.App.2003), cert. denied, 891 So.2d 998 (Ala.2004), cert. denied, 543 U.S. 1123, 125 S.Ct. 1054, 160 L.Ed.2d 1073 (2005) (quoting
 
 Ward v. State,
 
 610 So.2d 1190, 1191 (Ala.Crim.App.1992)). See also
 
 Ward v. State,
 
 814 So.2d 899, 908-10 (Ala.Crim.App.2000), cert. denied, 814 So.2d 925 (Ala.2001).
 

 “Where a defendant’s conviction is based solely on circumstantial evidence, ‘if the circumstances can be reconciled with the theory that someone else
 
 may
 
 have done the act, then the conviction is due to be reversed.’
 
 Ex parte Brown,
 
 499 So.2d 787, 788 (Ala.1986) (emphasis
 
 *512
 
 in original). ‘Circumstantial evidence alone is enough to support a guilty verdict of the most heinous crime, provided the jury believes beyond a reasonable doubt that the accused is guilty.’
 
 White v. State,
 
 294 Ala. 265, 272, 314 So.2d 857, cert. denied, 423 U.S. 951, 96 S.Ct. 373, 46 L.Ed.2d 288 (1975). ‘Circumstantial evidence is in nowise considered inferior evidence and is entitled to the same weight as direct evidence provided it points to the guilt of the accused.’
 
 Cochran v. State,
 
 500 So.2d 1161, 1177 (Ala.Cr.App.1984), affirmed in pertinent part, reversed in part on other grounds,
 
 Ex parte Cochran,
 
 500 So.2d 1179 (Ala.1985). ‘It is not necessary for a conviction that the defendant be proved guilty to the “exclusion of every possibility of innocence.’”
 
 Burks v. State,
 
 117 Ala. 148, 23 So. 530 (1898). ‘The facts and circumstances in evidence, if dissevered and disconnected, may be weak and inconclusive; but their probative force, when combined, as it was the province of the jury to combine them, under proper instructions from the court, may have satisfied them of the guilt of the defendant.’
 
 Howard v. State,
 
 108 Ala. 571, 18 So. 813, 815 (1895).”
 

 White v. State,
 
 546 So.2d 1014, 1017 (Ala.Crim.App.1989). Accord
 
 Williams v. State,
 
 795 So.2d 753, 775 (Ala.Crim.App.1999), aff'd, 795 So.2d 785 (Ala.2001).
 

 The record indicates that the State presented sufficient evidence to prove the elements of the capital offenses of murder committed during first-degree kidnapping. The evidence established that after Lewis, Free, and Hargedon met up with Kaye, the four proceeded to Lewis’s mobile home. At some point, Free and Kaye went outside and began to fight. While the two men were fighting, Lewis came outside with a shotgun in his hands and stated that it was time “to finish this.” However, Hargedon took the shotgun away from Lewis and took it back inside the mobile home. When Hargedon came back outside, she heard Lewis and Free arguing over who would get to shoot Kaye. Free and Kaye continued to fight until Lewis picked up a rock and hit Kaye in the head with it. Lewis told Free that they should kill Kaye because Kaye’s cooperation with law-enforcement officials resulted in a former coworker — Jay Causey — being indicted for trafficking in marijuana. Lewis then came up behind Kaye and started hitting him, saying: “Let’s kill him. He is the one that got J-Bird.” Lewis continued to hit Kaye, as Kaye begged Lewis not to hit him, until he lost consciousness. Free allegedly attempted to stop Lewis, but Lewis just laughed as he continued to hit and kick Kaye.
 

 Lewis then dragged Kaye over to the back of Kaye’s pick-up truck. Free helped Lewis put Kaye into the bed of the truck. Lewis told Free that they “were going to take a ride,” and the pair took Kaye’s truck — with Kaye’s body in the back — and drove to Florida. As he held a gun on Free, Lewis told Free which roads to take, eventually directing Free to stop on a bridge over the Choctawhatchee River. Lewis got out of the truck, pulled Kaye’s body out of the truck bed, and let him fall to the ground. Lewis ordered Free to help him pick up Kaye’s body and drop him over the side of the bridge and into the river below. Later that day, Lewis and Free were seen in Kaye’s pick-up truck. Both men had blood on their pants and shoes.
 

 There was ample evidence from which the jury could have concluded that Lewis committed murder during the course of kidnapping in the first degree. Indeed, this Court rejected an argument similar to Lewis’s claim that the State failed to prove that a kidnapping occurred in
 
 Duncan v.
 
 
 *513
 

 State,
 
 827 So.2d 888 (Ala.Crim.App.1999), aff'd, 827 So.2d 861 (Ala.2001), cert. denied, 537 U.S. 860, 128 S.Ct. 237, 154 L.Ed.2d 99 (2002).
 
 [10]
 
 We held:
 

 “The appellant’s argument that, because the victim initially entered the vehicle voluntarily, she was not forcibly confined is without merit. Merely because the victim initially agreed to accompany the individuals does not negate the fact that she was later forcibly confined. The concept of restraint is ‘concerned with intentional, unlawful and nonconsensual removal or confinement.’ § 13A-6-40, Commentary. This Court has previously held that a victim may voluntarily enter the place where she is later restrained against her will, and the crime still constitutes a kidnapping.
 
 T.R.D. v. State,
 
 673 So.2d 838 (Ala.Cr.App.1995);
 
 Mims v. State,
 
 591 So.2d 120 (Ala.Cr.App.1991);
 
 Jenkins v. State,
 
 627 So.2d 1034 (Ala.Cr.App.1992); and
 
 Musgrove v. State,
 
 519 So.2d 565 (Ala.Cr.App.1986).”
 

 Here, the evidence supports the jury’s verdict. Accordingly, there is no merit to Lewis’s claim that the State failed to establish sufficient proof that a kidnapping occurred or that Lewis lacked a particularized intent to kill Kaye.
 

 Lewis’s claim that Free’s version of events was not sufficiently corroborated by other evidence connecting him with Kaye’s kidnapping and murder is likewise without merit.
 

 Section 12-21-222, Ala.Code 1975, provides:
 

 “A conviction of felony cannot be had on the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the commission of the offense, and such corroborative evidence, if it merely shows the commission of the offense or the circumstances thereof, is not sufficient.”
 

 In
 
 Johnson v. State,
 
 820 So.2d 842 (Ala.Crim.App.2000), this Court discussed the level of proof sufficient for corroboration:
 

 “When the testimony of the accomplice is subtracted, the remaining testimony does not have to be sufficient by itself to convict the accused. As we stated in
 
 Ingram v. State,
 
 779 So.2d 1225, 1259 (Ala.Cr.App.1999):
 

 “ ‘A felony conviction cannot be had on the testimony of an accomplice unless that testimony is corroborated by other evidence tending to connect the defendant with the commission of the offense.
 
 Kuenzel v. State,
 
 [577 So.2d 474 (Ala.Cr.App.1990) ]; § 12-21-222. The corroboration evidence need not be strong, nor sufficient of itself to support a conviction, the reasoning being that it legitimately tend to connect the accused with the offense; it need not directly confirm any particular fact nor go to every material fact stated by the accomplice.
 
 Kuenzel v. State; Andrews v. State,
 
 370 So.2d 320 (Ala.Crim.App.1979).’ ”
 

 820 So.2d at 869. See also
 
 Ziegler v. State,
 
 886 So.2d 127, 143 (Ala.Crim.App.2003).
 

 Further, in
 
 Ex parte Scott,
 
 728 So.2d 172, 178 (Ala.1998), the Alabama Supreme Court recognized that the defendant’s proximity to the crime scene is a relevant consideration in determining whether an accomplice’s testimony was sufficiently corroborated.
 

 
 *514
 
 After carefully reviewing the record, we conclude that, even after subtracting Free’s accomplice testimony, there was ample evidence tending to connect Lewis with Kaye’s kidnapping and murder. Har-gedon observed Lewis hitting and kicking Kaye; she also heard Lewis and Free arguing over who would kill Kaye. Additionally, Lewis’s cousin, Kandy Harger, who lived nearby, heard sounds of a fight at Lewis’s residence during the early morning hours of April 26. Finally, Rodney Ray Alford, a former employee of Lewis’s who lived near the Choctawhat-chee River in Florida, testified that Lewis and Free showed up at his house between 6:00 and 7:00 a.m. on April 26 in a maroon pick-up truck and that Lewis had blood on his pants and shoes. Accordingly, there is no merit to Lewis’s claim that the evidence was insufficient to support his conviction. Free’s accomplice testimony was amply corroborated. Moreover, the jury was fully informed of Free’s status as an accomplice. The trial court instructed the jury that it should consider the testimony of any interested witness, such as Free, with particular caution. See
 
 Ziegler v. State,
 
 886 So.2d at 144. Based on the foregoing, no basis for reversal exists regarding this claim.
 

 IX.
 

 Lewis argues that the State was guilty of prosecutorial misconduct during closing argument of the guilt phase of his trial. Quoting a portion of the prosecutor’s remarks in the rebuttal portion of his closing argument, Lewis claims, generally, that the prosecutor’s closing argument was “so infected with improper and prejudicial comments that [Lewis] was denied his rights to due process and a fair trial.” (Lewis’s brief, p. 48.) Because no objections were raised to the allegedly improper remarks, we review Lewis’s claim under the plain-error standard.
 

 In reviewing claims of prosecutorial misconduct arising out of improper argument, this Court has followed the following principles:
 

 “A reviewing court must evaluate allegedly improper comments made by the prosecutor in the context of the entire proceeding in which the comments were made.
 
 Duren v. State,
 
 590 So.2d 360 (Ala.Cr.App.1990), aff'd, 590 So.2d 369 (Ala.1991), cert. denied, 503 U.S. 974, 112 S.Ct. 1594, 118 L.Ed.2d 310 (1992). ‘ “In judging a prosecutor’s closing argument, the standard is whether the argument so infected the trial with unfairness as to make the resulting conviction a denial of due process.’”
 
 Darden v. Wainwright,
 
 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (quoting
 
 Donnelly v. DeChristoforo,
 
 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)).
 

 “ Tn reviewing allegedly improper prosecutorial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial and not to view the allegedly improper acts in the abstract.
 
 Whitlow v. State,
 
 509 So.2d 252, 256 (Ala.Cr.App.1987);
 
 Wysinger v. State,
 
 448 So.2d 435, 438 (Ala.Cr.App.1983);
 
 Carpenter v. State,
 
 404 So.2d 89, 97 (Ala.Cr.App.1980), cert. denied, 404 So.2d 100 (Ala.1981). Moreover, this Court has also held that statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict.
 
 Orr v. State,
 
 462 So.2d 1013, 1016 (Ala.Cr.App.1984);
 
 Sanders v. State,
 
 426 So.2d 497, 509 (Ala.Cr.App.1982).’
 

 
 *515
 

 “Bankhead v. State,
 
 585 So.2d 97, 106 (Ala.Cr.App.1989), aff'd in relevant part, remanded on other grounds, 585 So.2d 112, 127 (Ala.1991), aff'd on return to remand, 625 So.2d 1141 (Ala.Cr.App.1992).”
 

 Lockhart v. State,
 
 715 So.2d 895, 902-03 (Ala.Crim.App.1997) (quoted with approval in
 
 McWhorter v. State,
 
 781 So.2d 257, 317-18 (Ala.Crim.App.1999), aff'd, 781 So.2d 330 (Ala.2000), cert. denied, 532 U.S. 976, 121 S.Ct. 1612, 149 L.Ed.2d 476 (2001)).
 

 We have carefully reviewed the prosecutor’s entire closing argument during the guilt phase of Lewis’s trial, paying particular attention to the context of the prosecutor’s remarks quoted in Lewis’s brief. Based on that review, it is clear that the prosecutor’s remarks were made in the heat of debate and in reply to various remarks made during defense counsel’s closing argument. Therefore, no basis for reversal exists.
 

 X.
 

 Lewis argues that the trial court made a number of errors in its jury instructions during the guilt phase of his trial.
 

 When reviewing a trial court’s jury instructions, this Court keeps in mind the following principles:
 

 “A trial court has broad discretion when formulating its jury instructions.
 
 See Williams v. State,
 
 611 So.2d 1119, 1123 (Ala.Cr.App.1992). When reviewing a trial court’s instructions, ‘“the court’s charge must be taken as a whole, and the portions challenged are not to be isolated therefrom or taken out of context, but rather considered together.” ’
 
 Self v. State,
 
 620 So.2d 110, 113 (Ala.Cr.App.1992) (quoting
 
 Porter v. State,
 
 520 So.2d 235, 237 (Ala.Cr.App.1987));
 
 see also Beard v. State,
 
 612 So.2d 1335 (Ala.Cr.App.1992);
 
 Alexander v. State,
 
 601 So.2d 1130 (Ala.Cr.App.1992).”
 

 Williams v. State,
 
 795 So.2d 753, 780 (Ala.Crim.App.1999), aff'd, 795 So.2d 785 (Ala.2001). “The absence of an objection in a case involving the death penalty does not preclude review of the issue; however, the defendant’s failure to object does weigh against his claim of prejudice.”
 
 Ex parte Boyd,
 
 715 So.2d 852, 855 (Ala.), cert. denied, 525 U.S. 968, 119 S.Ct. 416, 142 L.Ed.2d 338 (1998).
 

 A.
 

 In Part III of his brief, Lewis argues that the trial court erred in “failing to instruct the jury on accomplice testimony,” specifically, the requirement that accomplice testimony be corroborated.
 

 This Court has long applied the harmless-error rule in capital cases when the circuit court failed to instruct the jury on the requirement that an accomplice’s testimony be corroborated. See, e.g.,
 
 Hyde v. State,
 
 778 So.2d at 221;
 
 Arthur v. State,
 
 711 So.2d 1031, 1058-59 (Ala.Crim.App.1996), aff'd, 711 So.2d 1097 (Ala.1997);
 
 Gurley v. State,
 
 639 So.2d 557 (Ala.Crim.App.1993);
 
 Frazier v. State,
 
 562 So.2d 543, 558 (Ala.Crim.App.), rev’d on other grounds, 562 So.2d 560 (Ala.1989).
 

 Even though the court did not instruct the jury that Free was an accomplice, his status as a codefendant was made abundantly clear through his testimony. Moreover, the trial court’s instructions cautioned the jury to look for and to consider possible bias on the part of a witness. Finally, although Free testified against his codefendant, Lewis was not convicted based solely upon Free’s testimony. As previously noted, the State presented numerous witnesses and substantial physical evidence connecting Lewis with Kaye’s murder. This other evidence corroborated Free’s testimony and was sufficient to sup
 
 *516
 
 port Lewis’s conviction. Accordingly, any error in the court’s failure to charge the jury on the necessity of accomplice corroboration was harmless.
 

 B.
 

 In Part IV of his brief, Lewis challenges the correctness of the trial court’s instruction on complicity. Specifically, he contends that the court’s complicity charge was erroneous because it failed to include specific language that “the jury had to find that [Lewis] was an accomplice in the intentional killing and kidnapping of Kaye as opposed to being an accomplice after the fact or an accomplice to a lesser-included offense to the capital-murder charge.” (Lewis’s brief, p. 31.) Because Lewis did not object to the court’s instruction on complicity, we review this claim for plain error.
 

 When instructing the jury on complicity, the court stated:
 

 “Now, the State of Alabama also attempted or undertook to prove the guilt of this defendant here, Michael Jerome Lewis. And they — the law says that when they undertake to show that there was a combination of parties, two or more parties, more than one party involved in the transaction or engaged in the crime that was committed, if, in fact, you believe that there was a crime committed, that the burden is upon the State to prove that there was some conspiracy that acted between those persons on trial, and where two or more persons enter into a common enterprise or adventure, whether by prearrangement or entered into on an emergency, and that enterprise contemplates the commission of an offense, each is guilty of the offense committed, whether he did any overt act or not.
 

 “This rests upon the principle that one who is present, encouraging, aiding, abetting or assisting, or who is ready to aid, abet, or assist the actual perpetrator in the commission of the offense, is a guilty participant in the eyes of the law and is equally as guilty as the one who actually does the act.
 

 “One who is present, encouraging or ready to aid another under such circumstances must be presumed to be cognizant of that other person’s intention to the extent that I have expressed to you.
 

 “Aiding or abetting, under our law, comprehends all assistance rendered by act or words or encouragement or support or presence, actively or constructively, to render assistance should it become necessary. Of course, that is a question of law which addresses itself to you for a decision in this case.”
 

 (R. 789-91.) At the conclusion of the trial court’s instructions, the court also gave Lewis’s requested jury instructions nos. 37-43 regarding accomplice liability and/or complicity. (C. 195-201; R. 814-16.)
 

 We find no merit to Lewis’s claim. When viewed in its entirety and in its proper context, the trial court’s complicity charge contains no error. Moreover, given that seven of the complicity instructions were proposed by and given at Lewis’s request, Lewis cannot now seek reversal based on his own actions. See, e.g.,
 
 Clark v. State,
 
 896 So.2d 584, 640 (Ala.Crim.App.2003);
 
 Lewis v. State,
 
 889 So.2d 623, 651 (Ala.Crim.App.2003);
 
 McNabb v. State,
 
 887 So.2d 929, 989 (Ala.Crim.App.2001) (all recognizing the application of the invited-error rule in capital cases). Absent plain error, an invited error is waived. See
 
 Ex parte Bankhead,
 
 585 So.2d 112, 126 (Ala.1991).
 

 Likewise, Lewis’s reliance on our decision in
 
 Russaw v. State,
 
 572 So.2d 1288 (Ala.Crim.App.1990), is misplaced. In
 
 Russaw,
 
 the court failed to instruct the
 
 *517
 
 jury “that in order to find the defendant guilty of the capital offense charged in the indictment, the jury had to find that the defendant was an accomplice in the intentional killing as opposed to being an accomplice merely in the robbery.” 572 So.2d at 1292. As a result of the court’s failure to do so, this Court reversed Pus-saw’s conviction, stating that the trial court’s instructions were “highly confusing because of the failure to clearly distinguish the intent element in the crimes of capital murder, felony-murder, and murder in connection with the doctrine of accomplice liability.” 572 So.2d at 1293.
 

 Here, no such error occurred. The jury was extensively and repeatedly instructed on the elements of capital murder, murder, felony murder, manslaughter, and first-degree kidnapping (R. 768-75, 793-96, 805-814), as well as the legal principles regarding accomplice liability (R. 789-91, 814-16), and accessory after the fact (R. 814-16). No error, plain or otherwise, occurred in connection with the aforementioned jury instructions.
 

 C.
 

 In Part XII of his brief, Lewis argues that the trial court “erred in giving a substantial doubt charge,” specifically that it erred when it instructed the jury that it had to have a substantial doubt before it could acquit him. (Lewis’s brief, p. 50.) Lewis concedes that Alabama courts have held that such an instruction, by itself, does not rise to the level of error in
 
 Cage v. Louisiana,
 
 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990); however, he appears to argue that this instruction, when considered in conjunction with the claims raised in Part III (fading to instruct on accomplice testimony during guilt phase) and Part XVI (failing to instruct on residual doubt during penalty phase) of his brief is sufficient to warrant reversal of his conviction. We interpret Lewis’s argument as a claim that the trial court’s instruction on reasonable doubt was flawed in that it allegedly lowered the State’s burden of proof beyond a reasonable doubt and thus violated the holding in
 
 Cage v. Louisiana.
 
 Because Lewis did not object below, this claim is reviewed for plain error.
 

 Instructing the jury on reasonable doubt, the trial court stated:
 

 “Now, ladies and gentlemen, as I have told you repeatedly, the defendant — the burden of proving this defendant is guilty as charged in this indictment rests upon the State of Alabama. Before a conviction can be had in this case of any of these offenses that I have enumerated for you — and there are five offenses that I have enumerated for you — before a conviction could be had for any of those offenses, the State must satisfy the jury of the defendant’s guilt beyond a reasonable doubt.
 

 “Unless the State so satisfies you of the defendant’s guilt beyond a reasonable doubt, then, of course, he would be entitled to an acquittal at your hands.
 

 “For a verdict of guilty to be returned in this case, the entire jury must believe, from the evidence, beyond a reasonable doubt and to a moral certainty, that this defendant is guilty as charged in the indictment, either the charge in the indictment or one of the lesser included offenses that I have enumerated for you.
 

 “You must be satisfied of that to the exclusion of every probability of his innocence and every reasonable doubt of his guilt. If the prosecution has failed to furnish that measure of proof and so impress upon the minds of the jury of the defendant’s guilt, then, of course, this defendant should not be found guilty.
 

 
 *518
 
 “Now, ladies and gentlemen, I have told you repeatedly, and these lawyers have told you repeatedly, that the State has the burden of proving the defendant’s guilt beyond a reasonable doubt. The phrase reasonable doubt is generally said to be self-explanatory. Efforts to define it do not always clarify the term. But it may be some help to you to say that it’s a doubt which would justify — a doubt which would justify an acquittal must be an actual and substantial doubt, not a mere possible doubt.
 

 “A reasonable doubt is not a mere guess or surmise. And it is not a forced or capricious doubt.
 

 “If after considering all the evidence in this case you have an abiding conviction of the truth of the charge, then, of course, you are convinced beyond a reasonable doubt and it would be your duty to convict this defendant.
 

 “The reasonable doubt which [would] entitle an accused to an acquittal is not a mere fanciful, vague, conjectural or speculative doubt, but it’s a reasonable, substantial doubt arising from the evidence, or the lack of evidence, and remaining after a careful consideration of the testimony. It must be a doubt such as reasonable, fair-minded men and women would entertain under all the circumstances.
 

 “Now, you will observe that the State is not required to convince you of the defendant’s guilt beyond all doubt and to the point that you could not possibly be mistaken. But simply beyond a reasonable doubt and to a moral certainty.
 

 “Moral certainty is that degree of assurance which induces a man of sound mind to act without doubt upon the conclusions to which it leads. It’s a certainty that convinces and directs the understanding and satisfies the reason and judgment of those who are bound to act conscientiously upon it.”
 

 (R. 785-88.)
 

 In addressing similar claims, this Court has held:
 

 “ ‘The Due Process Clause of the Fourteenth Amendment “protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.”
 
 In re Winship,
 
 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970). In
 
 Cage v. Louisiana,
 
 the United States Supreme Court found that a jury charge that defined “reasonable doubt” by using the phrases “grave uncertainty,” “actual substantial doubt,” and “moral certainty” could have led a reasonable juror to interpret the instructions to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause. Subsequently, the Court “made it clear that the proper inquiry is not whether the instruction ‘could have’ been applied in an unconstitutional manner, but whether there is a reasonable likelihood that the jury
 
 did
 
 so apply it.”
 
 Victor v. Nebraska,
 
 511 U.S. 1, 6, 114 S.Ct. 1239, 1243, 127 L.Ed.2d 583 (1994) (quoting
 
 Estelle v. McGuire,
 
 502 U.S. 62, 72-73, and n. 4, 112 S.Ct. 475, 482 and n. 4, 116 L.Ed.2d 385 (1991), emphasis in original). Thus, the constitutional question presented here is whether there is a reasonable likelihood that the jury understood the instructions to allow the conviction based on proof insufficient to meet the
 
 Winship
 
 reasonable doubt standard.
 
 Victor v. Nebraska; Ex parte Kirby,
 
 643 So.2d 587 (Ala.), cert. denied, [513] U.S. [1023], 115 S.Ct. 591, 130 L.Ed.2d 504 (1994);
 
 Cox v. State,
 
 660 So.2d 233 (Ala.Cr.App.1994).
 

 “ ‘In reviewing the reasonable doubt instruction, we do so in the context of
 
 *519
 
 the charge as a whole.
 
 Victor v. Nebraska; Baker v. United States,
 
 412 F.2d 1069 (5th Cir.1969), cert. denied, 396 U.S. 1018, 90 S.Ct. 583, 24 L.Ed.2d 509 (1970);
 
 Williams v. State,
 
 538 So.2d 1250 (Ala.Cr.App.1988). So long as the definition of “reasonable doubt” in the charge correctly conveys the concept of reasonable doubt, the charge will not be considered so prejudicial as to mandate reversal.
 
 Victor v. Nebraska; Holland v. United States,
 
 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954).’ ”
 

 Lee v. State,
 
 898 So.2d 790, 841-42 (Ala.Crim.App.2001), cert. denied, 898 So.2d 874 (Ala.2004), cert. denied, 543 U.S. 924, 125 S.Ct. 309, 160 L.Ed.2d 222 (2004) (quoting
 
 Knotts v. State,
 
 686 So.2d 431, 459 (Ala.Crim.App.), opinion after remand, 686 So.2d 484 (Ala.Crim.App.1995), aff'd, 686 So.2d 486 (Ala.1996)). “ ‘Use of some but not all of the terminology found offensive in
 
 Cage
 
 does not automatically constitute reversible error.’ ”
 
 Taylor v. State,
 
 666 So.2d 36, 56 (Ala.Crim.App.1994), aff'd, 666 So.2d 73 (Ala.1995) (quoting
 
 Dobyne v. State,
 
 672 So.2d 1319, 1343 (Ala.Crim.App.1994), aff'd, 672 So.2d 1354 (Ala.1995)).
 

 We have reviewed the trial court’s charge on reasonable doubt in the “context of the entire oral charge.” The jury could not have interpreted the trial court’s instruction to allow a finding of guilt based upon a degree of proof below that mandated by the United States Constitution. The instruction clearly conveyed the concept of reasonable doubt and did not lessen the State’s burden of proof. Although we do not condone the trial court’s use of the phrase “substantial doubt,” the court’s mere use of this phrase in its instruction does not rise to the level of the instruction condemned in
 
 Cage.
 
 Indeed, the court’s instruction on reasonable doubt was similar to one we upheld in
 
 Turner v. State,
 
 924 So.2d 737, 775 (Ala.Crim.App.2002). Accordingly, we find no error, plain or otherwise, in the trial court’s instruction on reasonable doubt.
 

 XI.
 

 In part XI of his brief, Lewis argues that “the trial court’s redundant and randomly given jury instructions confused the jury.” (Lewis’s brief, p. 44.) The gist of Lewis’s complaint appears to be the length and detail of the trial court’s instructions on the offenses before the jury for its consideration in Lewis’s case. Lewis then complains about differences between the court’s instructions and the parties’ requested jury instructions given at the conclusion of the court’s oral charge. Again, because no objection was made at trial, this claim is reviewed for plain error.
 

 Initially, we note that much of the redundancy Lewis complains of results from the trial court’s giving the jury instructions Lewis himself requested. (R. 805-16.) As we have previously stated, the invited-error rule applies in capital and noncapital cases alike. See, e.g.,
 
 Clark v. State,
 
 896 So.2d at 640. Thus, absent plain error, any error was waived. Additional redundancy occurred when the jury asked to have the trial court redefine capital murder, murder, and felony murder, which it did. (R. 820-34.)
 

 Lewis cites our decision in
 
 Deutcsh v. State,
 
 610 So.2d 1212 (Ala.Crim.App.1992), in support of his claim that his rights were prejudiced by the court’s instructions.
 
 Deutcsh
 
 recognizes that the trial court “is responsible for giving the jury the guidance by which it can make appropriate conclusions from the testimony”; “[t]his duty is performed by clearly stating the relevant legal criteria.” 610 So.2d at 1218 (quoting
 
 United States v. Garrett,
 
 574 F.2d 778, 782 (3d Cir.1978)).
 

 
 *520
 
 “ ‘The difficulty of formulating clarifying instructions so as to avoid incomprehensibility is one which we readily recognize. “Because of the very commonness of [some pertinent] words, the straining for making the clear more clear has the trap of producing complexity and consequent confusion.”
 
 [United States v. Lawson,
 
 507 F.2d 433, 442 (7th Cir.1974), cert. denied, 420 U.S. 1004 (1975) ]. Nevertheless, where the articulation of the law is essential to the trial’s propriety, the task cannot be avoided, as difficult as it may be. It would be, we reluctantly admit, unrealistic to think that every juror understands every concept to which he or she is exposed in the court’s charge. The best we can do under our adversary system is to see that the necessarily applicable law is made available to the jury in as understandable as possible form.’ ”
 

 610 So.2d at 1219 (quoting
 
 United States v. Barclay,
 
 560 F.2d 812, 816 (7th Cir.1977)). When allegedly ambiguous jury instructions have purportedly prejudiced a defendant’s case, we must determine “ “whether there is a reasonable likelihood that the jury has applied the challenged instructions in a way’ that violates the constitution.”
 
 Estelle v. McGuire,
 
 502 U.S. 62, 72, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) (quoting
 
 Boyde v. California,
 
 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990)). See also
 
 Ingram v. State,
 
 779 So.2d 1225, 1261 (Ala.Crim.App.1999), aff'd, 779 So.2d 1283 (Ala.2000).
 

 Here, we find no evidence that the court’s instructions were erroneous or that the jury misapplied the instructions it was given. Indeed, absent the jury’s request that the trial court redefine the offenses of capital murder, murder, and felony murder, we find no evidence of any confusion on the part of the jury. Taken as a whole, the trial court’s instructions correctly conveyed to the jury the appropriate legal principles so that it could correctly perform its duty and determine the question of Lewis’s guilt. Accordingly, we find no plain error in the jury instructions given in this case.
 

 XII.
 

 In Part III of his brief, Lewis argues that the trial court erred when it failed to conduct a charge conference before counsel gave their closing arguments, at which the court could review the parties requested jury instructions.
 
 [11]
 
 Lewis cites this Court’s decision in
 
 Anderson v. State,
 
 533 So.2d 714 (Ala.Crim.App.1988), for the proposition that a trial court’s “failure to do so does not mandate reversal unless the court refuses to follow the rule after its attention has been called to it or prejudice results therefrom.” (Lewis’s brief, p. 30.) Because Lewis did not object to the court’s failure to hold a charge conference or to rule on his requested jury instructions before counsel began closing argument, we review this claim for plain error.
 

 In
 
 Anderson,
 
 we held that the trial court’s failure before closing argument to inform defense counsel of its refusal to instruct the jury on second-degree assault as a lesser-included offense prejudiced the defendant and required reversal in a prosecution for attempted murder that resulted in the defendant’s conviction for first-degree assault.
 

 Our decision in
 
 Anderson,
 
 however, is distinguishable from this case for several reasons. First, the court in
 
 Anderson
 
 actually held a charge conference before closing argument and advised counsel that it would instruct the jury on the
 
 *521
 
 charge of second-degree assault. Second, after advising counsel of its decision and counsel’s devoting a significant portion of his allotted time for closing argument on the evidence as it related to second-degree assault, the court reversed its earlier decision, depriving counsel of the opportunity to use his limited argument time to address the evidence as it related to attempted murder and first-degree assault — the only two offenses the jury had before it. Based on these specific facts, we held that the defendant’s case was prejudiced by the court’s action, despite the court’s attempt to explain to the jury — after deliberations began — why counsel had devoted such a significant portion of his argument to a charge that was not before the jury. 533 So.2d at 716-17.
 

 No such prejudice occurred to Lewis as a result of the trial court’s failure to hold a charge conference or to advise counsel of its decision before closing argument. Indeed, our review of the record indicates that although the trial court did not hold an actual charge conference or formally rule on counsel’s requested jury instructions before closing arguments began, the court informally advised counsel as to its decision regarding which offenses it planned to include in its instructions — including the court’s decision to instruct the jury on the lesser-included offenses of felony murder, murder, manslaughter, and kidnapping. (R. 700.) Given these circumstances, no basis for reversal exists.
 

 XIII.
 

 In Part XX of his brief, Lewis asks this Court to adopt a new standard of proof to be used in prosecuting capital-murder cases. Lewis contends that the State’s burden of proof in a capital-murder case should be “beyond
 
 any
 
 doubt,” rather than the traditional “beyond a reasonable doubt” standard currently in use. Lewis argues: “This standard, which has been proposed by some judges and commentators and by the drafters of the Model Penal Code, reflects the irrevocability of the death penalty.” (Lewis’s brief, p. 69.) Because this claim is raised for the first time on appeal, we review it under the plain-error standard.
 

 In Alabama, “the standard of proof in criminal cases is beyond a reasonable doubt.”
 
 Jackson v. State,
 
 640 So.2d 1025, 1032 (Ala.Crim.App.1992). As this Court noted in
 
 White v. State,
 
 546 So.2d 1014 (Ala.Crim.App.1989):
 

 “ ‘The state [is] not required to remove by proof the possibility that defendant was innocent, but only to establish his guilt beyond a reasonable doubt.’
 
 Rice v. State,
 
 204 Ala. 104, 106, 85 So. 437 (1920);
 
 Payne v. State,
 
 424 So.2d 722, 725 (Ala.Cr.App.1982). ‘[I]f there was a probability of defendant’s innocence, the defendant should be found not guilty. A probability of defendant’s innocence is the equivalent of a reasonable doubt of guilt, which requires his acquittal.... The law does not require full proof of guilt, — another expression for clear or positive proof, beyond any doubt, — but only such proof as produces satisfaction beyond reasonable doubt.’
 
 Bones v. State,
 
 117 Ala. 138, 23 So. 138, 139 (1898). ‘A defendant’s guilt need not be proved “clearly, fully, and conclusively,” and, [instructions] thus framed, ... exact too high a degree of proof.’
 
 McClain v. State,
 
 182 Ala. 67, 62 So. 241, 245 (1913). ‘In criminal prosecutions, circumstantial evidence should be such as to exclude a rational probability of innocence to justify conviction.’
 
 Chisolm v. State,
 
 45 Ala. 66, 70 (1871). The evidence need not exclude hypotheses ‘rendered exceedingly remote and improbable, and morally, though not abso
 
 *522
 
 lutely, impossible.... ’
 
 Id.
 
 ‘[T]he true test of the sufficiency of circumstantial evidence to justify a conviction is whether the circumstances as proved produce a moral conviction to the exclusion of every reasonable doubt. It is not necessary for the circumstances to be “such as are absolutely incompatible, upon any reasonable hypothesis, with the innocence of the accused.” ’
 
 Mitchell v. State,
 
 114 Ala. 1, 22 So. 71, 72 (1897). ‘The law does not require the exclusion of every hypothesis of innocence, but only every reasonable hypothesis.”
 
 Walker v. State,
 
 134 Ala. 86, 32 So. 703, 704 (1902). ‘It is not the law, that the evidence must exclude every other hypothesis than that of defendant’s guilt, or than the existence of the facts essential to conviction. The rule goes no further than to the exclusion of other reasonable — not speculative, imaginary, possible, hypotheses.’
 
 Little v. State,
 
 89 Ala. 99, 103, 8 So. 82, 83 (1890). ‘It is not any doubt arising out of the evidence which authorizes a jury to acquit one on trial for [a] crime, but only a reasonable doubt of such guilt generated by the evidence in the cause, — not a possible, speculative, or imaginary doubt.’
 
 Perry v. State,
 
 87 Ala. 30, 6 So. 425, 427 (1889).
 

 “ ‘Human testimony is rarely so clear and full, as to exclude conjectured, divergent possibilities. Neither does mathematical certainty, or physical impossibility, define the rule. Conviction, resting on human testimony, can never attain the certainty of mathematical demonstration, or repel all possible doubt of its correctness. A rule so exacting would paralyze the punitive arm of the law. “A doubt which requires an acquittal, must be actual and substantial, not mere possibility or speculation. It is not a mere possible doubt, because every thing relating to human affairs, and depending upon moral evidence, is open to some possible or imaginary doubt.’”
 
 Coleman v. State,
 
 59 Ala. 52, 54 (1877).
 

 “See also
 
 Mose v. State,
 
 36 Ala. 211, 231 (1860). ‘The jury need never find that the defendant cannot be innocent.... There might be a possibility of defendant’s innocence, and yet from the whole evidence, no reasonable doubt of his guilt.’
 
 Morris v. State,
 
 124 Ala. 44, 27 So. 336, 337 (1900).
 

 “A mere conflict in the evidence does not authorize an acquittal.
 
 Monk v. State,
 
 258 Ala. 603, 605, 64 So.2d 588 (1953). A conviction is warranted though the evidence is susceptible of being interpreted that another committed the crime, where such interpretation is not of sufficient force to raise a reasonable doubt of accused’s guilt.
 
 Brown v. State,
 
 121 Ala. 9, 25 So. 744, 745 (1899).”
 

 546 So.2d at 1021-22.
 

 The federal courts likewise apply the beyond-a-reasonable-doubt standard set out in
 
 Jackson v. Virginia,
 
 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), when assessing the sufficiency of the evidence, whether direct or circumstantial, to support a criminal conviction. The “relevant question is whether, after viewing the evidence in the light most favorable to the prosecution,
 
 any
 
 rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” 443 U.S. at 319, 99 S.Ct. 2781. As the Supreme Court went on to explain, the beyond-a-reasonable-doubt standard “gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.” 443 U.S. at 319, 99 S.Ct. 2781.
 

 
 *523
 
 It is clear that the proof beyond a reasonable doubt standard is based on well-established Alabama and federal caselaw. We see no reason to depart from such long-standing precedent.
 

 Penalty-Phase Issues
 
 XIV.
 

 Section § 13A-5-45(g), Ala.Code 1975, provides:
 

 “The defendant shall be allowed to offer any mitigating circumstance defined in Sections 13A-5-51 and 13A-5-52. When the factual existence of an offered mitigating circumstance is in dispute, the defendant shall have the burden of interjecting the issue, but once it is interjected the state shall have the burden of disproving the factual existence of that circumstance by a preponderance of the evidence.”
 

 Despite the plain language of § 13A-5-45(g), Lewis argues that the State enjoys a higher burden of proof when seeking to disprove the factual existence of a mitigating circumstance. Specifically, Lewis contends that when disproving the existence of a mitigating circumstance, the State should be required to do so “beyond a reasonable doubt” or “by clear and convincing evidence,” rather than by a preponderance of the evidence, as set out in § 13A-5-45, Ala.Code 1975. This claim was not presented to the trial court. Thus, it is subject to review only under the plain-error standard.
 

 Section 13A-5-45(g) is not unconstitutional because it provides a lower standard for disproving mitigating evidence. Indeed, this Court has held that “it is constitutionally permissible to place the burden of proving the mitigating circumstances on the defendant.”
 
 Cochran v. State,
 
 500 So.2d 1161, 1172 (Ala.Crim.App.1984), rev’d on other grounds, 500 So.2d 1179 (Ala.1985). Moreover, both this Court and the Alabama Supreme Court have recognized on numerous occasions that the proper burden of proof when the State attempts to disprove a mitigating circumstance is “by a preponderance of the evidence.” See, e.g.,
 
 George v. State,
 
 717 So.2d 844, 848 (Ala.1996);
 
 Dill v. State,
 
 600 So.2d 343, 362 (Ala.Crim.App.1991), aff'd, 600 So.2d 372 (Ala.1992), cert. denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993). We note that § 13A-5-45(g) nevertheless imposes a more stringent standard on the State to disprove the existence of mitigating circumstances than it does on the defendant — who must only “interject” the issue of mitigation. Moreover, as the State correctly points out, this Court has previously rejected claims regarding the claims requiring the State to disprove the existence of mitigating circumstances only by a “preponderance of the evidence,” rather than by a higher standard of proof: “Since the burden to prove mitigating circumstances could constitutionally be placed entirely on a defendant, [an] appellant is not justified in complaining about the statute which places a burden on the State to disprove evidence offered in mitigation when the factual existence of the mitigating evidence is in dispute.”
 
 Haney v. State,
 
 603 So.2d 368, 391 (Ala.Crim.App.1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993). No basis for reversal exists as to this claim.
 

 XV.
 

 Lewis argues that the State was guilty of several instances of prosecutorial misconduct during closing argument at the penalty phase of his trial. Specifically, he contends that the prosecutor improperly vouched for the State’s case, and that the prosecutor improperly argued victim-impact evidence.
 

 
 *524
 
 In reviewing these claims, we again begin our analysis by looking to the legal principles set out in Part IX of this opinion. See
 
 Lockhart v. State, 715
 
 So.2d at 902-03.
 

 A.
 

 Lewis first argues that the prosecutor improperly vouched for the credibility of the State’s case, particularly the testimony of Lewis’s codefendant, Free, who testified against him. We note that Lewis did not object to the prosecutor’s argument at trial. Therefore, we review this claim under the plain-error standard.
 

 In
 
 DeBruce v. State,
 
 651 So.2d 599, 610-11 (Ala.Crim.App.1993), aff'd, 651 So.2d 624 (Ala.1994), this Court stated:
 

 “A distinction must be made between an argument by the prosecutor personally vouching for a witness, thereby bolstering the credibility of the witness, and an argument concerning the credibility of a witness based upon the testimony presented at trial. ‘[PJrosecutors must avoid making personal guarantees as to the credibility of the state’s witnesses.’
 
 Ex parte Parker,
 
 610 So.2d 1181 (Ala.1992). See
 
 Ex parte Waldrop,
 
 459 So.2d 959, 961 (Ala.1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 323 (1985).
 

 “ ‘ “Attempts to bolster a witness by vouching for his credibility are normally improper and error.” ... The test for improper vouching is whether the jury could reasonably believe that the prosecutor was indicating a personal belief in the witness’ credibility.... This test may be satisfied in two ways. First, the prosecution may place the prestige of the government behind the witness, by making explicit personal assurances of the witness’ veracity.... Secondly, a prosecutor may implicitly vouch for the witness’ veracity by indicating that information not presented to the jury supports the testimony.’
 

 “United States v. Sims,
 
 719 F.2d 375, 377 (11th Cir.1983), cert. denied, 465 U.S. 1034, 104 S.Ct. 1304, 79 L.Ed.2d 703 (1984).”
 

 Accord
 
 Wilson v. State,
 
 777 So.2d 856, 903 (Ala.Crim.App.1999), aff'd, 777 So.2d 935 (Ala.2000), cert. denied, 531 U.S. 1097, 121 S.Ct. 826, 148 L.Ed.2d 709 (2001);
 
 Price v. State,
 
 725 So.2d 1003, 1030 (Ala.Crim.App.1997), aff'd, 725 So.2d 1063 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999).
 

 As part of his closing argument, the prosecutor explained the role he had played in prosecuting Lewis’s codefendant, Free, as well as his rationale for calling Free to testify against Lewis. The prosecutor noted that, as the district attorney, he knew that Free “got no deal” to testify. The prosecutor then set out his case, explaining why death was the appropriate punishment for Lewis. In response to the prosecutor’s closing argument, defense counsel countered by presenting his explanation of why Lewis should not be sentenced to death — including the fact that Lewis’s accomplice was sentenced to life imprisonment without the possibility of parole, rather than death. On rebuttal, the prosecutor responded to defense counsel’s comments, stating that although Free was sentenced to life imprisonment without the possibility of parole, he had asked that Free be sentenced to death — just as he was asking for Lewis to be sentenced to death. He explained that he was asking that Lewis be sentenced to death, based on Lewis’s role as Kaye’s shooter.
 

 After carefully reviewing the closing arguments of both the prosecutor and defense counsel, we conclude that the prosecutor’s comments did not constitute
 
 *525
 
 vouching for the State’s case. Instead, it appears that the prosecutor’s initial remarks were an explanation of the State’s case and his impressions based on the evidence. Therefore, his comments do not constitute error. See
 
 Boyd v. State,
 
 715 So.2d at 841. Further, the prosecutor’s subsequent remarks during rebuttal constituted a reply-in-kind to defense counsel’s arguments regarding Free’s sentence. “ ‘A prosecutor has a right based on fundamental fairness to reply in kind to the argument of defense counsel.’ ”
 
 Johnson v. State,
 
 823 So.2d 1, 47 (Ala.Crim.App.2001) (quoting
 
 DeBruce v. State,
 
 651 So.2d at 609).
 

 B.
 

 Lewis also argues that the prosecutor improperly presented victim-impact evidence during his closing argument.
 

 Initially, we note that victim-impact evidence is not inadmissible. As this Court stated in
 
 Miller v. State,
 
 913 So.2d 1148 (Ala.Crim.App.2004):
 

 “The United States Supreme Court has specifically recognized the admissibility of victim-impact testimony to offer the jury a “quick glimpse” of the uniqueness of the life taken by the defendant.
 
 Payne v. Tennessee,
 
 501 U.S. 808, 823, 830-31, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). Moreover, this Court has followed the holding in
 
 Payne v. Tennessee
 
 on numerous occasions, recognizing the admissibility of evidence of this kind as relevant to the determination of the appropriate punishment to be imposed. See, e.g.,
 
 Taylor v. State,
 
 808 So.2d 1148, 1167 (Ala.Crim.App.2000), aff'd, 808 So.2d 1215 (Ala.2001), cert. denied, 534 U.S. 1086, 122 S.Ct. 824, 151 L.Ed.2d 705 (2002).
 

 “ ‘ “If a State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no per se bar. A State may legitimately conclude that evidence about the victim and about the impact of murder on the victim’s family is relevant to the jury’s decision as to whether or not the death penalty should be imposed. There is no reason to treat such evidence differently than other relevant evidence is treated.” ’
 

 “Boyd v. State,
 
 746 So.2d 364, 383 (Ala.Crim.App.1999) (quoting
 
 Payne v. Tennessee,
 
 501 U.S. at 827, 111 S.Ct. 2597). See also
 
 McNair v. State,
 
 653 So.2d 320, 331 (Ala.Crim.App.1992), aff'd, 653 So.2d 353 (Ala.1994) (‘[A] prosecutor may present and argue evidence relating to the victim and the impact of the victim’s death on the victim’s family in the penalty phase of a capital trial.’).”
 

 913 So.2d at 1164.
 

 Moreover, our review of the record convinces us that the prosecutor’s objected-to remarks constituted a reply-in-kind to defense counsel’s argument—specifically, that part of counsel’s argument focusing on the testimony of Lewis’s mother in an attempt to persuade the jury to spare Lewis’s life. In an attempt to countermand counsel’s attempt to draw upon the sympathy of the jury by emphasizing the testimony of Lewis’s mother, the prosecutor was entitled to “reply in kind” by pointing out to the jury the loss suffered by Kaye’s family—particularly his mother—as a result of Lewis’s actions. Given these circumstances, no basis for reversal exists.
 

 XVI.
 

 Lewis next argues that the jury should have been instructed that there is a presumption that the mitigating circumstances outweigh the aggravating circumstances and, further, that there is a pre
 
 *526
 
 sumption that the law favors a sentence of life imprisonment without the possibility of parole, rather than death. Because this claim was not presented to the trial court, we review this claim under the plain-error doctrine.
 

 When reviewing a trial court’s jury instructions, this Court keeps in mind the following principles:
 

 “A trial court has broad discretion when formulating its jury instructions.
 
 See Williams v. State,
 
 611 So.2d 1119, 1128 (Ala.Cr.App.1992). When reviewing a trial court’s instructions, ‘ “the court’s charge must be taken as a whole, and the portions challenged are not to be isolated therefrom or taken out of context, but rather considered together.” ’
 
 Self v. State,
 
 620 So.2d 110, 113 (Ala.Cr.App.1992) (quoting
 
 Porter v. State,
 
 520 So.2d 235, 237 (Ala.Cr.App.1987));
 
 see also Beard v. State,
 
 612 So.2d 1335 (Ala.Cr.App.1992);
 
 Alexander v. State,
 
 601 So.2d 1130 (Ala.Cr.App.1992).”
 

 Williams v. State,
 
 795 So.2d 753, 780 (Ala.Crim.App.1999), aff'd, 795 So.2d 785 (Ala.2001). “The absence of an objection in a case involving the death penalty does not preclude review of the issue; however, the defendant’s failure to object does weigh against his claim of prejudice.”
 
 Ex parte Boyd,
 
 715 So.2d 852, 855 (Ala.), cert. denied, 525 U.S. 968, 119 S.Ct. 416, 142 L.Ed.2d 338 (1998).
 

 Initially, we note that Lewis has cited no Alabama caselaw in support of his claim that such a jury instruction should have been given. Moreover, the court’s instructions were materially identical to Alabama’s pattern jury instructions regarding these legal principles. This Court, as well as the Supreme Court, has generally declined to find plain error when the trial court gives an instruction materially identical to the pattern jury instructions. “A trial court’s following of an accepted pattern jury instruction weighs heavily against any finding of plain error.” Price
 
 v. State,
 
 725 So.2d 1003, 1058 (Ala.Crim.App.1997), aff'd, 725 So.2d 1063 (Ala.1998), cert. denied 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999); accord
 
 Lewis v. State,
 
 889 So.2d 623, 690 (Ala.Crim.App.2003).
 

 We have carefully reviewed the trial court’s instructions. When taken in its entirety, the court’s instructions in this case clearly comport with current Alabama caselaw regarding the weighing of aggravating circumstances and mitigating circumstances. The court explained that the jury could recommend the death penalty only if it determined that the aggravating circumstances outweighed the mitigating circumstances. The court’s instruction did not run afoul of either
 
 Ex parte Bryant,
 
 951 So.2d 724 (Ala.2002), or
 
 Ex parte Trawick,
 
 698 So.2d 162 (Ala.1997). Thus, we find no plain error in the instruction as given.
 

 XVII.
 

 Lewis argues that the trial court erred in refusing to instruct the jury on residual doubt during the penalty phase of his trial.
 

 Relying on the United States Supreme Court decision in
 
 Franklin v. Lynaugh,
 
 487 U.S. 164, 172-76, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988), this Court has held on numerous occasions that “capital defendants have no right to demand jury consideration of ‘residual doubts’ in the sentencing phase.” See, e.g.,
 
 Melson v. State,
 
 775 So.2d 857, 898 (Ala.Crim.App.1999), aff'd, 775 So.2d 904 (Ala.2000);
 
 Rieber v. State,
 
 663 So.2d 985, 995 (Ala.Crim.App.1994);
 
 Carroll v. State,
 
 599 So.2d 1253, 1271 (Ala.Crim.App.1992), aff'd, 627 So.2d 874 (Ala.1993), cert. denied, 510 U.S. 1171, 114
 
 *527
 
 S.Ct. 1207, 127 L.Ed.2d 554 (1994). We explained in
 
 Melson:
 

 “In
 
 Myers v. State,
 
 699 So.2d 1281 (Ala.Cr.App.1996), aff'd, 699 So.2d 1285 (Ala.1997), cert. denied, 522 U.S. 1054, 118 S.Ct. 706, 189 L.Ed.2d 648 (1998), this court stated the following concerning jury instructions on ‘residual doubf:
 

 “ ‘ “ ‘Our cases do not support the proposition that a defendant who has been found to be guilty of a capital crime beyond a reasonable doubt has a constitutional right to reconsideration by the sentencing body of lingering doubts about his guilt. We have recognized that some states have adopted capital sentencing procedures that permit defendants in some cases to enjoy the benefit of doubts that linger from the guilt phase of the trial, see
 
 Lockhart v. McCree,
 
 476 U.S. 162, 181, 106 S.Ct. 1758, 1768, 90 L.Ed.2d 137 (1986), but we have never indicated that the Eighth Amendment requires states to adopt such procedures. To the contrary, as the plurality points out, we have approved capital sentencing procedures that preclude consideration by the sentencing body of “residual doubts” about guilt. See
 
 Ante,
 
 [487 U.S. at 173 n. 6, 108 S.Ct.] at 2327, n. 6.
 

 “ ‘ “ ‘Our decisions mandating jury consideration of mitigating circumstances provide no support for petitioner’s claim because “residual doubt” about guilt is not a mitigating circumstance. We have defined mitigating circumstances as facts about the defendant’s character or background, or the circumstances of the particular offense, that may call for a penalty less than death, [citations omitted]. “Residual doubt” is not a factor about the defendant or the circumstances of the crime. It is instead a lingering uncertainty about facts, a state of mind that exists somewhere between “beyond a reasonable doubt” and “absolute certainty.” ’ ” ’
 

 “699 So.2d at 1283-84, quoting
 
 Harris v. State,
 
 632 So.2d 503, 535 (Ala.Crim.App.1992), aff'd, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (D.Ala.1995), quoting in turn
 
 Franklin v. Lynaugh,
 
 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988).”
 

 775 So.2d at 898-99. Accordingly, the circuit court correctly denied Lewis’s requested jury charge on “residual doubt.”
 

 XVIII.
 

 Lewis argues that the circuit court erred by finding the aggravating circumstance that Lewis’s murder of Kaye was especially heinous, atrocious, or cruel when compared to other capital offenses. See § 13A-5-49(8), Ala.Code 1975. Specifically, Lewis argues that the trial court’s finding as to the existence of this aggravating circumstance was in error because the court’s order did not contain the express finding that Kaye’s murder was “conscienceless or pitiless
 
 and
 
 unnecessarily torturous to the victim,” and that the court’s decision was based on improper factors and/or evidence.
 

 With regard to the finding that the victim’s death was especially heinous, atrocious, or cruel when compared to other capital offenses, the court, which had set out findings regarding the victim’s injuries in the factual background portion of the sentencing order, further noted:
 

 “The evidence showed beyond a reasonable doubt that the crime committed shocks the conscience of the Court. The victim was beaten repeatedly about his head with a large rock as he begged for his life. He was then placed in the bed of his pick-up truck and shot twice with a handgun. The autopsy also showed
 
 *528
 
 that he sustained numerous pain-causing wounds to his body which were capable of causing death. Then, to compound the atrocities that brought Timothy John Kaye’s life to an end, his body was taken and dumped in the Choctawhat-chee River where it stayed for almost a week. The motive behind this killing was apparently the fact that Timothy John Kaye had been a police informer in a large federal marijuana investigation in the Dothan area.”
 

 (C. 265.)
 

 In
 
 Barksdale v. State,
 
 788 So.2d 898 (Ala.Crim.App.), cert. denied, 788 So.2d 915 (Ala.2000), we addressed the application of this aggravating circumstance, stating as follows:
 

 “In
 
 Ex parte Kyzer,
 
 399 So.2d 330, 334 (Ala.1981), this Court held that the standard applicable to the ‘especially heinous, atrocious, or cruel’ aggravating circumstance under § 13A-5-49(8), Ala. Code 1975, is that the crime must be one of ‘those conscienceless or pitiless homicides which are unnecessarily torturous to the victim.’ The appellant’s assertion that the murder was not unnecessarily torturous to the victim because he did not intentionally inflict prolonged pain upon the victim is without merit. It is not, as the appellant argues, incumbent upon the State to prove that he inflicted savagery or brutality upon the victim, or that he took pleasure in having committed the murder. It is necessary that the State present evidence that the victim suffered some type of physical violence beyond that necessary or sufficient to cause death. Additionally, to support this aggravating factor, the time between at least some of the injurious acts must be an appreciable lapse of time, sufficient enough to cause prolonged suffering, and the victim must be conscious or aware when at least some of the additional or repeated violence is inflicted. See
 
 Norris v. State,
 
 [793] So.2d [847] (Ala.Cr.App.1999).”
 

 788 So.2d at 907-08.
 

 We also addressed the application of this aggravating circumstance in
 
 Taylor v. State,
 
 808 So.2d 1148 (Ala.Crim.App.2000), aff'd, 808 So.2d 1215 (Ala.2001), noting:
 

 “The Alabama appellate courts’ interpretation of ‘especially heinous, atrocious, or cruel’ has passed muster under the Eighth Amendment because those courts have consistently defined the term to include only ‘those conscienceless or pitiless homicides which are unnecessarily torturous to the victim.’
 
 Ex parte Clark,
 
 [728 So.2d 1126 (Ala.1998) ], citing,
 
 Lindsey v. Thigpen,
 
 875 F.2d 1509 (11th Cir.1989). The Alabama appellate courts have considered the infliction of psychological torture as especially indicative that the offense was ‘especially heinous, atrocious or cruel.’ Thus, the mental suffering where a victim witnesses the murder of another and then realizes that soon he or she will also be killed, has been found to be sufficient to support a finding of this aggravating circumstance.
 
 Norris v. State,
 
 793 So.2d 847, 854 (Ala.Cr.App.1999). As the trial judge pointed out in his sentencing order, two of the victims here witnessed Taylor kill another victim. Both tried to run and hide, but were captured. Both begged and pleaded for their lives; one offering money and property, the other pleading for the sake of her children. Both were deliberately and methodically executed with a gunshot to the head as they pleaded for their lives. These murders were not accomplished in a rapid-fire manner; there was sufficient time between the three murders for the next victim to be placed in significant fear for his or her life, and the evidence is clear that each
 
 *529
 
 was well aware of what was about to happen.”
 

 808 So.2d at 1169.
 

 The evidence presented by the State established that the physical violence inflicted on Kaye went far beyond that necessary or sufficient to cause death, that Kaye suffered appreciably during the assault, and that psychological torture was inflicted on Kaye in that his beating lasted for a sufficient period for him to realize his own fate. Indeed, the evidence established that during the beating Kaye begged his assailants to spare his life. Given these circumstances, the State presented sufficient evidence that Kaye’s murder was especially heinous, atrocious, or cruel when compared to other capital offenses. Indeed, this Court has upheld the aggravating circumstance that the capital offense was especially heinous, atrocious, or cruel compared to other capital offenses on several occasions when a victim’s death was caused by a prolonged and vicious beating such as the one inflicted on Kaye by Lewis and his accomplice. See,
 
 e.g., Ziegler v. State,
 
 886 So.2d 127, 147 (Ala.Crim.App.2008). Accordingly, the trial court properly concluded that the murder of Kaye was “especially heinous, atrocious, or cruel.” See
 
 Ex parte Clark,
 
 728 So.2d 1126, 1140 (Ala.1998).
 

 XIX.
 

 Lewis argues that the State had a duty to disclose, in writing, any mitigating circumstances or facts of which it was aware. Additionally, Lewis contends, “the State had a duty to stipulate for the jury that these disclosures were to be considered by the jury as mitigators.” (Lewis’s brief, p. 75.) Because this issue was not raised at trial, we will review this claim under the plain-error standard.
 

 In
 
 Brady v. Maryland,
 
 878 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the United States Supreme Court established that a prosecutor has a constitutional duty to disclose evidence favorable to the defendant. Alabama courts have long recognized this principle of law. See, e.g.,
 
 Smith v. State,
 
 698 So.2d 189, 207 (Ala.Crim.App.1996), aff'd, 698 So.2d 219 (Ala.), cert. denied, 522 U.S. 957, 118 S.Ct. 385, 139 L.Ed.2d 300 (1997). Further, “[t]his duty extends to evidence favorable on the issue of sentencing as well as on the issue of guilt.”
 
 Ex parte Monk,
 
 557 So.2d 832, 837 (Ala.1989) (citing
 
 Brady v. Maryland,
 
 373 U.S. at 87, 83 S.Ct. 1194). The disclosure of evidence favorable to the defendant is particularly important in a capital case, given the requirement in § 13A-5-45(g) that a “defendant shall be allowed to offer any mitigating circumstance, as defined in Sections 13A-5-51 and 13A-5-52.” In
 
 Ex parte Monk,
 
 the Alabama Supreme Court recognized that capital cases, by their very nature, were sufficiently different from other cases to justify the exercise of judicial authority to order the State to maintain ongoing “open file” policy in regard to discovery on the part of the defendant, subject to certain prosecutorial safeguards. 557 So.2d at 836-37. The Supreme Court recognized that one purpose of “open file” discovery was to allow a defendant’s attorneys to view all the evidence and make an independent determination of what, if any, of the State’s file might be considered as mitigating evidence. As the Court explained: “The prosecutor cannot screen files for potential mitigating evidence to disclose to the defense counsel because, ‘[w]hat one person may view as mitigating, another may not.’ ”
 
 Ex parte Monk,
 
 557 So.2d at 837 (quoting
 
 Dobbert v. Strickland,
 
 718 F.2d 1518, 1524 (11th Cir.1983), cert. denied, 468 U.S. 1220, 104 S.Ct. 3591, 82 L.Ed.2d 887 (1984)). Here, Lewis filed a motion requesting open file discovery; at a motion hearing on August 19, 1998, the
 
 *530
 
 State agreed to provide open file discovery. Thus, any mitigating evidence in the possession of the State was subject to discovery by defense counsel during counsel’s review of the State’s files. Moreover, our review of the record fails to indicate any failure by the State to disclose potential mitigating evidence to Lewis.
 

 We now turn to Lewis’s claim that the State should be required to stipulate to potentially mitigating evidence. However, such a requirement would run afoul of § 13A-5-45(g), which permits the State to disprove the factual existence of a disputed mitigating circumstance. Moreover, such a claim is inconsistent with well-settled Alabama law. As we stated in
 
 Duncan v. State,
 
 624 So.2d 1084, 1086 (Ala.Crim.App.1993), “[i]n Alabama, a party is not required to accept his adversary’s stipulation, but may insist on proving the fact.” Quoted with approval in
 
 Peraita v. State,
 
 897 So.2d 1161, 1193 (Ala.Crim.App.2003), aff'd, 897 So.2d 1227 (Ala.2004). Accordingly, no basis for reversal exists as to this claim.
 

 XX.
 

 Lewis argues that the trial court acted arbitrarily and capriciously in sentencing him to death. Lewis’s argument is divided into two parts: first, that the trial court improperly ignored mitigating circumstances and failed to perform a proportionality analysis; and second, that the trial court erroneously concluded that the aggravating circumstances outweighed the mitigating circumstances.
 

 A.
 

 Lewis claims that the trial court failed to consider a number of nonstatutory mitigating circumstances; namely, (1) that Free, Lewis’s codefendant, had been sentenced to life imprisonment without the possibility of parole; (2) that Lewis was intoxicated on the night of Kaye’s murder; (3) that two jurors recommended a sentence of life imprisonment without the possibility of parole; (4) that Lewis was suffering from sleep deprivation on the night Kaye was killed; (5) that Lewis had the potential for rehabilitation; (6) that Lewis had a positive relationship with his family; (7) that Lewis was a “hard worker”; (8) that Lewis exhibited good behavior while in jail; and (9) that Lewis’s life still had purpose and value.
 

 In reviewing this argument, we are guided by the following principles:
 

 “A sentencer in a capital case may not refuse to consider or be ‘precluded from considering’ mitigating factors.
 
 Eddings v. Oklahoma,
 
 455 U.S. 104, 110, 102 S.Ct. 869, 874, 71 L.Ed.2d 1 (1982) (quoting
 
 Lockett v. Ohio,
 
 438 U.S. 586, 604, 98 S.Ct. 2954, 2964-65, 57 L.Ed.2d 973 (1978)). The defendant in a capital case generally must be allowed to introduce any relevant mitigating evidence regarding the defendant’s character or record and any of the circumstances of the offense, and consideration of that evidence is a constitutionally indispensable part of the process of inflicting the penalty of death.
 
 California v. Brown,
 
 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987);
 
 Ex parte Henderson,
 
 616 So.2d 348 (Ala.1992);
 
 Haney v. State,
 
 603 So.2d 368 (Ala.Cr.App.1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993). Although the trial court is required to consider all mitigating circumstances, the decision of whether a particular mitigating circumstance is proven and the weight to be given it rests with the sentencer.
 
 Carroll v. State,
 
 599 So.2d 1253 (Ala.Cr.App.1992), aff'd, 627 So.2d 874 (Ala.1993), cert. denied, 510 U.S. 1171, 114 S.Ct. 1207, 127 L.Ed.2d 554 (1994). See also
 
 Ex parte
 
 
 *531
 

 Harrell,
 
 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985).”
 

 Williams v. State,
 
 710 So.2d 1276, 1347 (Ala.Crim.App.1996), aff'd, 710 So.2d 1350 (Ala.1997). See also
 
 Boyd v. State,
 
 715 So.2d 825, 840 (Ala.Crim.App.1997), aff'd, 715 So.2d 852 (Ala.1998).
 

 We have carefully considered the evidence presented by Lewis during the penalty phase of his trial, together with the trial court’s sentencing order. Contrary to Lewis’s claim, it is clear from the court’s sentencing order that the trial court considered all of the evidence Lewis presented as mitigation. However, it is equally clear that the trial court concluded that only part of the evidence presented actually constituted mitigating evidence. Indeed, this Court rejected a similar argument in
 
 Haney v. State,
 
 603 So.2d 368, 389 (Ala.Crim.App.1991), aff'd, 603 So.2d 412 (Ala.1992), noting:
 

 “In the instant case, appellant was afforded a full and unrestricted opportunity to present mitigating evidence regarding her character, background, motivations, and record and the circumstances of the offense. The order of the trial court clearly shows that it considered all relevant statutory and non-statutory mitigating evidence. We find no merit to appellant’s contention that the trial court failed to consider her evidence of non-statutory mitigating circumstances. It is not required that the evidence submitted by the accused as a non-statutory mitigating circumstance be weighed as a mitigating circumstance by the sentencer, in this case, the trial court; although consideration of all mitigating circumstances is required, the decision of whether a particular mitigating circumstance is proven and the weight to be given it rests with the sentencer.
 
 Cochran v. State,
 
 500 So.2d 1161 (Ala.Cr.App.1984), aff'd in pertinent part, remanded on other part, 500 So.2d 1179 (Ala.1985), aff'd on return to remand, 500 So.2d 1188 (Ala.Cr.App.), aff'd, 500 So.2d 1064 (Ala.1986), cert. denied, 481 U.S. 1033, 107 S.Ct. 1965, 95 L.Ed.2d 537 (1987).”
 

 Likewise, the fact that Lewis’s co-defendant, Free, was sentenced to life imprisonment without the possibility of parole — rather than death — does not render the trial court’s decision to sentence Lewis to death “excessive and disproportionate.” Addressing this issue, the Alabama Supreme Court has written:
 

 “The law does not require that each person involved in a crime receive the same sentence.
 
 Wright v. State,
 
 494 So.2d 726, 739 (Ala.Crim.App.1985) (quoting
 
 Williams v. Illinois,
 
 399 U.S. 235, 243, 90 S.Ct. 2018, 26 L.Ed.2d 586 (1970)). Appellate courts should ‘examine the penalty imposed upon the defendant in relation to that imposed upon his accomplices, if any.’
 
 Beck v. State,
 
 396 So.2d 645, 664 (Ala.1980). However,
 
 the sentences received by codefendants are not controlling per se, Hamm v. State,
 
 564 So.2d 453, 464 (Ala.Crim.App.1989),
 
 and this Court has not required or directed that every person implicated in a crime receive the same punishment. Williams v. State,
 
 461 So.2d 834, 849 (Ala.Crim.App.1983), rev’d on other grounds, 461 So.2d 852 (Ala.1984). ‘ “There is not a simplistic rule that a co-defendant may not be sentenced to death when another co-defendant receives a lesser sentence.” ’
 
 Id.
 
 (quoting
 
 Collins v. State,
 
 243 Ga. 291, 253 S.E.2d 729 (1979)).”
 

 Ex parte McWhorter,
 
 781 So.2d 330, 344 (Ala.2000) (emphasis supplied). This Court has likewise declined to abandon the practice of individualized sentencing based on a defendant’s particular role in the capi
 
 *532
 
 tal offense. See, e.g.,
 
 Taylor v. State,
 
 808 So.2d 1148, 1201 (Ala.Crim.App.2000), aff'd, 808 So.2d 1215 (Ala.2001), cert. denied, 534 U.S. 1086, 122 S.Ct. 824, 151 L.Ed.2d 705 (2002), in which this Court upheld imposition of Taylor’s death sentence based on the fact that Taylor — and not his codefendant — was the triggerman who actually shot and killed the victim. Accord
 
 Irvin v. State,
 
 940 So.2d 331, 368-69 (Ala.Crim.App.2005).
 

 Here, it is clear that the trial court considered all the evidence offered as mitigation by Lewis. The fact that the court determined that only a portion of that evidence actually qualified as mitigating evidence does not render the trial court’s decision to sentence Lewis to death “arbitrary and capricious.” Nor does the fact that the trial court sentenced Lewis’s co-defendant to life imprisonment without the possibility of parole render Lewis’s death sentence “excessive and disproportionate,” given that the evidence indicated that Lewis, the defendant, rather than Free, the codefendant, was the triggerman in Kaye’s murder.
 

 B.
 

 Lewis also argues that the trial court erroneously concluded that the aggravating circumstances outweighed the mitigating circumstances. The gist of Lewis’s argument appears to be based on numbers; namely, that because the trial court found the existence of only two aggravating circumstances and five mitigating circumstances, Lewis should not have been sentenced to death.
 

 Contrary to Lewis’s contention, however, § 13A-5-48, Aa.Code 1975, explicitly states that the process of weighing the aggravating circumstances and mitigating circumstances to determine a capital defendant’s sentence “shall not be defined to mean a mere tallying of aggravating and mitigating circumstances for the purposes of numerical comparison.” Aabama courts have made it equally clear that the weighing process is more than a matter of mere numerical tallying. See, e.g.,
 
 Ex parte Cook,
 
 369 So.2d 1251, 1257 (Ala.1978) (“We can readily envision situations where several aggravating circumstances may not be sufficient to outweigh only one mitigating circumstance and, on the other hand, where numerous mitigating circumstances may be present but opposed to one aggravating circumstance so outrageous as to justify the death penalty.”). See also
 
 Bush v. State,
 
 695 So.2d 70, 94 (Ala.Crim.App.), aff'd, 695 So.2d 138 (Ala.), cert. denied, 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997).
 

 Here, the trial court found the existence of two aggravating circumstances: (1) that Kaye’s murder was committed while Lewis and Free were engaged in the commission of first-degree kidnapping; and (2) that Kaye’s murder was especially heinous, atrocious, or cruel, when compared to other capital offenses. The trial court stated that although only two aggravating circumstances were found to exist, the seriousness of those circumstances clearly outweighed the five mitigating circumstances, noting:
 

 “Taking into account all possible mitigating circumstances, both those enumerated by statute and those offered by the circumstances of the life of Michael Jerome Lewis, all the mitigating circumstances found to exist taken together are extremely weak in comparison to the aggravating circumstances of this offense.
 

 “I, therefore, order that the Defendant shall be punished by death as provided by law.”
 

 (C. 266.)
 

 Given the circumstances surrounding Kaye’s death, the trial court could have
 
 *533
 
 concluded that the aggravating circumstances outweighed the mitigating circumstances. Thus, no basis for reversal exists as to this claim.
 

 XXI.
 

 Lewis argues that Alabama’s death penalty violates the holdings in
 
 Ring v. Arizona,
 
 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and
 
 Bush v. Gore,
 
 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000). Specifically, Lewis contends that our death-penalty scheme runs afoul of
 
 Ring v. Arizona
 
 because (1) it authorizes the trial judge — rather than the jury — to determine the existence of aggravating circumstances and mitigating circumstances, and to determine whether the aggravating circumstances outweigh the mitigating circumstances; (2) it does not require a unanimous finding by the jury as to whether the aggravating circumstances exist beyond a reasonable doubt and whether the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt; (3) it does not require that the indictment returned against Lewis specify the aggravating circumstances the State intends to offer during the penalty phase; and (4) it does not require the jury to issue written findings regarding which aggravating circumstances it found to exist. Additionally, Lewis contends that our death-penalty statute runs afoul of
 
 Bush v. Gore
 
 because it fails to set forth uniform standards as to how much weight a jury’s sentencing recommendation should be given by the trial judge.
 

 A.
 

 In
 
 Ring,
 
 the United States Supreme Court applied its earlier holding in
 
 Apprendi v. New Jersey,
 
 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), to death-penalty cases and held that “[c]api-tal defendants ... are entitled to a jury determination on any fact on which the legislature conditions an increase in their maximum punishment.”
 
 Ring,
 
 536 U.S. at 589, 122 S.Ct. 2428.
 

 Lewis argues that
 
 Apprendi
 
 and
 
 Ring
 
 require that the aggravating circumstances be set out in the indictment returned against him. Further, he argues, these decisions are consistent with well-established legal precedent mandating that the accused be provided notice of the facts upon which the State intends to rely at trial, particularly the aggravating circumstances it intends to establish. The State counters by arguing that Lewis’s death sentence complies with applicable Alabama law and that nothing in
 
 Apprendi, Ring,
 
 or any other decision requires the State to include the aggravating circumstances in the indictment or to give an accused notice of the aggravating circumstances upon which the State intends to rely.
 
 [12]
 

 In several recent decisions, both this Court and the Alabama Supreme Court have agreed with the State’s rationale that
 
 Ring
 
 did not invalidate Alabama’s death-penalty statute, which vests the ultimate sentence determination in the hands of the trial judge and not a jury. See, e.g.,
 
 Ex parte Hodges,
 
 856 So.2d 936 (Ala.2003);
 
 Ex parte Waldrop,
 
 859 So.2d 1181 (Ala.2002);
 
 Duke v. State,
 
 889 So.2d 1, 41 (Ala.Crim.App.2002) (opinion on return to remand), cert. granted, sentence of death vacated pursuant to
 
 Roper v. Simmons,
 
 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), 544 U.S. 901, 125 S.Ct. 1588, 161 L.Ed.2d 270;
 
 Turner v. State,
 
 924 So.2d 737, 785 (Ala.Crim.App.2002);
 
 Stallworth v. State,
 
 868 So.2d 1128, 1178 (Ala.Crim
 
 *534
 
 .App.2001) (opinion on return to second remand). In each of these cases, we recognized the narrowness of the holding in
 
 Ring,
 
 noting that “[t]he
 
 Ring
 
 Court held that any aggravating circumstance that increased a sentence to death must be proved to a jury beyond a reasonable doubt”; however, we noted that the
 
 Ring
 
 Court “did not reach the question whether judicial sentencing or judicial override was constitutional.”
 
 Stallworth v. State,
 
 868 So.2d at 1183 (opinion on return to second remand). Indeed, we quoted the following language from a footnote in
 
 Ring:
 

 “ ‘Ring’s claim is tightly delineated: He contends only that the Sixth Amendment required jury findings on the aggravating circumstances asserted against him. No aggravating circumstance related to past convictions in his case; Ring therefore does not challenge
 
 Almendarez-Torres v. United States,
 
 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998), which held that the fact of prior conviction may be found by the judge even if it increases the statutory maximum sentence. He makes no Sixth Amendment claim with respect to mitigating circumstances. See
 
 Apprendi v. New Jersey,
 
 530 U.S. 466, 490-91, n. 16, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) (noting “the distinction the Court has often recognized between facts in aggravation of punishment and facts in mitigation” (citation omitted [in
 
 Ring
 
 ])).
 
 Nor does he argue that the Sixth Amendment required the jury to make the ultimate determination whether to impose the death penalty.
 
 See
 
 Proffitt v. Florida,
 
 428 U.S. 242, 252, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976) (plurality opinion) (“[I]t has never [been] suggested that jury sentencing is constitutionally required”). He does not question the Arizona Supreme Court’s authority to reweigh the aggravating and mitigating circumstances after that court struck one aggravator. See
 
 Clemons v. Mississippi,
 
 494 U.S. 738, 745, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990). Finally, Ring does not contend that his indictment was constitutionally defective. See
 
 Apprendi,
 
 530 U.S., at 477, n. 3, 120 S.Ct. 2348, 147 L.Ed.2d 435 (Fourteenth Amendment “has not ... been construed to include the Fifth Amendment right to ‘presentment or indictment of a Grand Jury’ ”).’ ”
 

 Stallworth v. State,
 
 868 So.2d at 1183-84 (quoting
 
 Ring,
 
 536 U.S. at 597 n. 4, 122 S.Ct. 2428) (emphasis added).
 

 This Court, in
 
 Stallworth v. State,
 
 specifically rejected an argument virtually identical to Lewis’s — namely, that “the indictment [against him] was void because it failed to include in the indictment the aggravating circumstances” that supported the capital offense. 868 So.2d at 1186. We rejected Stallworth’s argument, holding that neither
 
 Ring v. Arizona
 
 nor
 
 Apprendi v. New Jersey
 
 modified prior Alabama caselaw, “which holds that aggravating circumstances do not have to be alleged in the indictment.” 868 So.2d at 1186. The indictment returned against Lewis advised him of the crime with which he was charged — the capital offense of murder during kidnapping, in violation of § 13A-5-40(a)(l), Ala.Code 1975 — and set forth the elements of the offense that the State was required to prove. Included in the indictment was the aggravating circumstance of kidnapping in the first degree, thus placing Lewis on notice that, if convicted, he could be facing a death sentence. Because this single aggravating circumstance placed Lewis on notice that, if convicted of the charged offense he could be facing a potential death sentence, it was unnecessary for the State to amend the indictment so that it included all of the aggravating circumstances the State intended to prove at trial.
 

 
 *535
 
 Likewise, neither
 
 Ring v. Arizona
 
 nor
 
 Apprendi v. New Jersey
 
 requires that an accused be provided with advance notice of all aggravating circumstances upon which the State intends to rely. Indeed, this Court has stated the following with regard to the other enumerated aggravating circumstances listed in § 13A-5-49 that are not elements of a capital offense:
 

 “The aggravating circumstances enumerated in § 13A-5-49 that may lead to the imposition of the death penalty in a capital case are not elements of the offense and are not required to be set forth in the indictment.
 
 Dobard v. State,
 
 435 So.2d 1338, 1347 (Ala.Cr.App.1982), aff'd, 435 So.2d 1351 (Ala.1983), cert. denied, 464 U.S. 1063, 104 S.Ct. 745, 79 L.Ed.2d 203 (1984). A defendant has no right to advance notice of the state’s intention to rely on any of the aggravating circumstances.
 
 Clark v.
 
 Dugger; 834 F.2d 1561, 1566 (11th Cir.1987), cert. denied, 485 U.S. 982, 108 S.Ct. 1282, 99 L.Ed.2d 493 (1988);
 
 Knotts v. State,
 
 686 So.2d 431 (Ala.Cr.App.[1995]);
 
 Ruffin v. State,
 
 397 So.2d 277, 282 (Fla.), cert. denied, 454 U.S. 882, 102 S.Ct. 368, 70 L.Ed.2d 194 (1981). The list of aggravating circumstances in § 13A-5-49 is exclusive and puts the defendant charged with a capital felony on notice of those circumstances against which the defendant may be required to defend. This statutory notice satisfies constitutional requirements.”
 

 Bush v. State,
 
 695 So.2d 70, 87 (Ala.Crim.App.1995), aff'd, 695 So.2d 138 (Ala.), cert. denied, 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997). Cf.
 
 Arthur v. State,
 
 711 So.2d 1031 (Ala.Crim.App.1996), aff'd, 711 So.2d 1097 (Ala.1997) (when aggravating circumstances relied on by the State are elements of the capital offense they must be charged in the indictment).
 

 Here, Lewis was given notice of the aggravating circumstance that constituted an element of the capital offense with which he was charged. Accordingly, the circuit court correctly denied Lewis’s request for such notice.
 

 Lewis further argues that
 
 Ring
 
 requires the jury to issue written findings regarding which aggravating circumstances it finds to exist.
 

 This Court has rejected similar claims in previous death-penalty decisions. See, e.g.,
 
 Walker v. State,
 
 932 So.2d 140, 147 (Ala.Crim.App.2004). The Alabama Supreme Court has likewise rejected this argument. The Supreme Court has held, in numerous cases, that the jury’s verdict finding a defendant guilty of capital murder during the guilt phase of his trial, indicated that the jury had unanimously found a proffered aggravating circumstance included within the § 13A-5-40(a), Ala.Code 1975, definition of the particular capital-murder offense charged in the indictment. See, e.g.,
 
 Ex parte Hodges,
 
 856 So.2d 936 (Ala.2003);
 
 Ex parte Waldrop,
 
 859 So.2d 1181 (Ala.2002);
 
 Stallworth v. State,
 
 868 So.2d 1128 (Ala.Crim.App.2001) (opinion on return to second remand), cert. denied, 868 So.2d 1189 (Ala.2003). But see
 
 Ex parte McGriff
 
 908 So.2d 1024, 1039 (Ala.2004) (authorizing prospective use of a penalty-phase special interrogatory). Moreover, in
 
 Ex parte McNabb,
 
 887 So.2d 998 (Ala.2004), the Supreme Court held that even a nonunanimous recommendation of death by the jury proved that the jury, including the jurors who voted against the recommendation of death, had unanimously found the existence of a proffered aggravating circumstance, even though the circumstance was not included within the definition of the particular capital-murder offense charged in the indictment, because the trial court had specifically instructed the jury that it could not
 
 *536
 
 proceed to a vote on whether to impose the death penalty unless it had already unanimously agreed that the aggravating circumstance existed. Because the jury recommended by a vote of 10-2 that Lewis be sentenced to death, it is clear that it unanimously found the existence of at least one aggravating circumstance.
 

 B.
 

 Lewis also contends that our death-penalty scheme violates the Equal Protection Clause because, he says, it is arbitrary and disparate in that it fails to set forth uniform standards as to the weight a trial court must give a jury’s sentencing recommendation. As authority for this proposition, Lewis cites the decision in
 
 Bush v. Gore.
 
 We fail to see how this decision lends support for Lewis’s claim, given that the Supreme Court took care to state that its decision was “limited to the present circumstances,” noting that “the problem of equal protection in election processes generally present many complexities.” 531 U.S. at 109, 121 S.Ct. 525. Moreover, in
 
 Harris v. Alabama,
 
 513 U.S. 504, 511-15, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995), the United States Supreme Court rejected a claim that Alabama’s death penalty statute was unconstitutional because it did not specify what weight the trial court must afford a jury’s recommendation. Alabama courts have rejected similar claims that trial judges deprive defendants of equal protection under the law by employing different processes in determining what weight to give a jury’s recommendation as to sentencing. See, e.g.,
 
 Smith v. State,
 
 756 So.2d 892, 920 (Ala.Crim.App.1997), aff'd, 756 So.2d 957 (Ala.), cert. denied, 531 U.S. 830, 121 S.Ct. 82, 148 L.Ed.2d 44 (2000). Thus, no basis for reversal exists as to these claims.
 

 XXII.
 

 In Part XVIII of his brief, Lewis makes a general argument that Alabama’s death penalty is unconstitutional because, he says, “there is a substantial risk that we are executing the innocent and executing the guilty, who deserve punishment, but not the death penalty.” (Lewis’s brief, p. 67.) Lewis also contends that the death penalty is unconstitutional because of geographic and racial disparities in the charging, sentencing, and imposition of the death penalty. Finally, he contends that the death penalty is unconstitutional because, he says, it is applied in an arbitrary, capricious, and irrational manner in violation of the Eighth and Fourteenth Amendments to the United States Constitution.
 

 Alabama’s statutory death-penalty scheme has repeatedly been upheld against constitutional challenges. A comprehensive listing of the cases in which Alabama appellate courts have rejected such challenges can be found in
 
 Travis v. State,
 
 776 So.2d 819, 873 (Ala.Crim.App.1997), aff'd, 776 So.2d 874 (Ala.2000), cert. denied, 531 U.S. 1081, 121 S.Ct. 785, 148 L.Ed.2d 681 (2001). Further, Lewis makes no individualized claim that, as it specifically applies to him, execution by lethal injection constitutes cruel and unusual punishment. As we stated in
 
 Bryant v. State,
 
 951 So.2d 732, 747-48 (Ala.Crim.App.2003) (opinion on return to remand):
 

 “We note that Alabama’s statutory death-penalty scheme has repeatedly been upheld against constitutional challenges. A comprehensive listing of the cases dealing with these challenges can be found in
 
 Travis v. State,
 
 776 So.2d 819, 873 (Ala.Crim.App.1997), aff'd, 776 So.2d 874 (Ala.2000), cert. denied, 531 U.S. 1081 (2001). Moreover, we know of no authority in support of the general proposition that death by lethal injection violates a defendant’s constitutional rights. Indeed, a number of jurisdictions have rejected such claims. See,
 
 *537
 
 e.g.,
 
 Sims v. State,
 
 754 So.2d 657, 668 (Fla.2000);
 
 State v. Carter,
 
 89 Ohio St.3d 593, 608, 734 N.E.2d 345 (2000);
 
 Ritchie v. State,
 
 809 N.E.2d 258, 262 (Ind.2004);
 
 Wheeler v. Commonwealth,
 
 121 S.W.3d 173, 186 (Ky.2003).
 
 [3]
 
 Today, we join these jurisdictions in holding that death by lethal injection is not per se cruel and unusual punishment.
 

 [[Image here]]
 

 See also
 
 Brown v. State,
 
 11 So.3d 866, 927 (Ala.Crim.App.2007);
 
 Belisle v. State,
 
 11 So.3d 256, 318 (Ala.Crim.App.2007);
 
 Brooks v. State,
 
 973 So.2d 380, 420-21 (Ala.Crim.App.2007). In addition to Alabama, other states have likewise rejected constitutional challenges to execution by lethal injection, finding this method is almost “ ‘universally recognized as the most humane method of execution, and least apt to cause unnecessary pain.’ ”
 
 State v. Webb,
 
 252 Conn. 128, 145, 750 A.2d 448, 457 (2000) (citing, in turn,
 
 Woolls v. McCotter,
 
 798 F.2d 695, 698 (5th Cir.), cert. denied, 478 U.S. 1031, 107 S.Ct. 15, 92 L.Ed.2d 769 (1986);
 
 Kelly v. Lynaugh,
 
 862 F.2d 1126, 1135 (5th Cir.1988), cert. denied, 492 U.S. 925, 109 S.Ct. 3263, 106 L.Ed.2d 608 (1989);
 
 Hill v. Lockhart,
 
 791 F.Supp. 1388, 1394 (E.D.Ark.1992);
 
 Felder v. Estelle,
 
 588 F.Supp. 664, 674 (S.D.Tex.1984);
 
 State v. Hinchey,
 
 181 Ariz. 307, 315, 890 P.2d 602 (1995);
 
 State v. Deputy,
 
 644 A.2d 411, 421 (Del.Super.1994);
 
 People v. Stewart,
 
 123 Ill.2d 368, 386, 123 Ill.Dec. 927, 528 N.E.2d 631 (1988), cert. denied, 489 U.S. 1072, 109 S.Ct. 1356, 103 L.Ed.2d 824 (1989);
 
 State v. Moen,
 
 309 Or. 45, 98-99, 786 P.2d 111 (1990);
 
 Hopkinson v. State,
 
 798 P.2d 1186, 1187 (Wyo.1990)). We note, however, that since this Court released its decision in
 
 Bryant,
 
 one California court has held that lethal injection “as actually administered in practice” violates the prohibition against cruel and unusual punishment. See
 
 Morales v. Tilton,
 
 465 F.Supp.2d 972, 974 (N.D.Cal.2006). Moreover, on September 25, 2007, the United States Supreme Court announced that it would consider whether execution by lethal injection violated the Eighth Amendment’s prohibition against cruel and unusual punishment. See
 
 Baze v. Rees,
 
 551 U.S. 1192, 128 S.Ct. 34, 168 L.Ed.2d 809 (2007). Until the United States Supreme Court provides further guidance on this issue, we decline to revisit our holding in
 
 Bryant
 
 and its progeny, given the number of other jurisdictions that have rejected the merits of a similar claim.
 

 XXIII.
 

 Lewis claims, in Part XXI of his brief, that “the appellate courts are not independently finding and weighing mitigation evidence.” (Lewis’s brief, p. 70.) The gist of Lewis’s claim appears to be that § 13A-5-53, Ala.Code 1975, not only requires this Court to independently consider the aggravating circumstances and mitigating circumstances offered by the parties and found to exist by the trial court, but also requires it to consider mitigating evidence that the trial court did not consider. This Court has rejected similar claims in previous death-penalty decisions.
 

 “In support of this argument, Clark asks this Court to consider a litany of mitigating circumstances that the trial court
 
 *538
 
 found not to exist. (See Part XIII of this opinion.) However, as this Court stated in
 
 Roberts v. State,
 
 735 So.2d 1244 (Ala.Crim.App.1997):
 

 “ ‘In capital cases, it is the duty of this court to independently determine whether the sentence of death is appropriate in a particular case. In order to reach this conclusion, we must reweigh the aggravating circumstances and the mitigating circumstances
 
 as found by the trial court.’
 

 “735 So.2d at 1269 (emphasis added). See also
 
 Guthrie v. State,
 
 689 So.2d 935 (Ala.Crim.App.1996), aff'd, 689 So.2d 951 (Ala.), cert. denied, 522 U.S. 848, 118 S.Ct. 135, 139 L.Ed.2d
 
 84
 
 (1997). This Court cannot, as Clark urges us to do, consider mitigating circumstances not found to exist by the trial court.”
 

 Clark v. State,
 
 896 So.2d 584, 657-58 (Ala.Crim.App.2000). Thus, we are unable to consider mitigating evidence not considered by the trial court.
 

 XXIV.
 

 Lewis contends that the cumulative effect of the alleged errors discussed in his brief to this Court injuriously affected his substantial rights, and, thus, requires that his conviction and death sentence be reversed.
 

 The Alabama Supreme Court has set forth the cumulative-error rule as follows: “[WJhile, under the facts of a particular case, no single error among multiple errors may be sufficiently prejudicial to require reversal under Rule 45, if the accumulated errors have ‘probably injuriously affected substantial rights of the parties,’ then the cumulative effect of the errors may require reversal.”
 
 Ex parte
 
 Woods, 789 So.2d 941, 942-43 n. 1 (Ala.2001) (quoting Rule 45, Ala.R.App.P.). Applying this standard to Lewis’s allegation of cumulative error, we have scrupulously reviewed the record and find no evidence that the cumulative effect of any of the individually nonreversible errors in this case affected Lewis’s substantial rights at trial.
 

 XXV.
 

 Lewis requests, in Part XXIII of his brief, that this Court examine the record for plain error. As we stated at the outset, because Lewis was sentenced to death, the plain-error standard is the correct standard of review. Moreover, as required by Rule 45A, Ala.R.App.P., we have searched the record for any error that may have adversely affected Lewis’s substantial rights and have found none.
 

 XXVI.
 

 Finally, Lewis reminds this Court of its responsibility under § 13A-5-53, Ala.Code 1975, to review the propriety of his death sentence.
 
 [13]
 
 In so doing, Lewis argues that death is not the appropriate sentence in his case, and he urges this Court to set aside his sentence.
 

 Lewis was indicted and convicted of murder committed during a kidnapping in the first degree. § 13A-5-40(a)(l), Ala. Code 1975. The jury, by a vote of 10 to 2, recommended that Lewis be sentenced to death.
 

 The record reflects that Lewis’s sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. See § 13A-5-53(b)(l), Ala. Code 1975.
 

 The trial court found that the aggravating circumstances outweighed the mitigating circumstances and mandated that Lewis be sentenced to death. The court found the existence of two aggravating circumstances: (1) that the capital offense was
 
 *539
 
 committed while Lewis was engaged in the commission of first-degree kidnapping, see § 13A-5-49(4), Ala.Code 1975; and (2) that the murder was especially heinous, atrocious, or cruel when compared to other capital offenses, see § 13A-5-49(8), Ala. Code 1975. The trial court found the existence of none of the mitigating circumstances enumerated in § 13A-5-51, Ala. Code 1975. Pursuant to § 13A-5-52, the court found evidence of the following non-statutory mitigating circumstance: (1) that Lewis “suffered at least three head injuries in his younger years, two of which were fairly severe”; (2) that Lewis “was physically and verbally abused by his stepfather,” and that he witnessed his stepfather physically and verbally abuse his mother and half-brother; (3) that Lewis “was made to live in a motel room by himself as a child, and was required to work around the motel his stepfather operated before and after school, even late into the night”; (4) that Lewis had abused a number of controlled substances and alcohol; and (5) that Lewis suffered mild cognitive impairment as a result of his head injuries. However, the trial court found that the aggravating circumstances outweighed the mitigating circumstances and mandated that Lewis be sentenced to death.
 

 The trial court’s finding that the aggravating circumstance that the murder was committed during the commission of first-degree kidnapping is supported by the evidence. The trial court’s finding that the victim’s death was especially heinous, atrocious, or cruel when compared to other capital offenses is likewise supported by the record, as discussed in Part XVIII of this opinion.
 

 The fact that the trial court found the existence of two aggravating circumstances and “some evidence” of numerous nonstatutory mitigating circumstances does not indicate that the court’s decision to sentence Lewis to death was erroneous. In
 
 Bush v. State,
 
 695 So.2d 70 (Ala.Crim.App.1995), aff'd, 695 So.2d 138 (Ala.), cert. denied, 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997), this Court stated:
 

 “ ‘[T]he sentencing authority in Alabama, the trial judge, has unlimited discretion to consider any perceived mitigating circumstances, and he can assign appropriate weight to particular mitigating circumstances. The United States Constitution does not require that specific weights be assigned to different aggravating and mitigating circumstances.
 
 Murry v. State,
 
 455 So.2d 53 (Ala.Cr.App.1983), rev’d on other grounds, 455 So.2d 72 (Ala.1984). Therefore, the trial judge is free to consider each case individually and determine whether a particular aggravating circumstance outweighs the mitigating circumstances or vice versa.
 
 Moore v. Balkcom,
 
 716 F.2d 1511 (11th Cir.1983). The determination of whether the aggravating circumstances outweigh the mitigating circumstances is not a numerical one, but instead involves the gravity of the aggravation as compared to the mitigation.’
 

 “Clisby v. State,
 
 456 So.2d 99, 102 (Ala.Cr.App.1983).”
 

 695 So.2d at 94. As the Alabama Supreme Court stated in
 
 Ex parte Cook,
 
 369 So.2d 1251, 1257 (Ala.1978): “We can readily envision situations where several aggravating circumstances may not be sufficient to outweigh only one mitigating circumstance and, on the other hand, where numerous mitigating circumstances may be present but opposed to one aggravating circumstance so outrageous as to justify the death penalty.” Accord
 
 Carr v. State,
 
 640 So.2d 1064, 1074-75 (Ala.Crim.App.1994);
 
 Magwood v. State,
 
 548 So.2d 512, 514 (Ala.
 
 *540
 
 Crim.App.), aff'd, 548 So.2d 516 (Ala.1988), cert. denied, 493 U.S. 923, 110 S.Ct. 291, 107 L.Ed.2d 271 (1989).
 

 We find this to be the case here. The sentencing order indicates that the trial court considered the mitigating evidence Lewis offered but determined that mitigation was outweighed by the aggravating circumstances and sentenced Lewis to death. Its decision is supported by the record, and we agree with the trial court’s findings.
 

 Section 13A-5-53(b)(2), Ala.Code 1975, requires us to independently weigh the aggravating and mitigating circumstances to determine the propriety of Lewis’s death sentence. After independently weighing the aggravating circumstances and the mitigating circumstances, we find that the death sentence is appropriate in this case.
 

 As required by § 13A-5-53(b)(3), Ala. Code 1975, we must determine whether Lewis’s death sentence was disproportionate or excessive when compared to the penalties imposed in similar cases. Lewis killed Tim Kaye during a kidnapping in the first degree. Similar crimes have been punished by death on numerous occasions. See, e.g.,
 
 Ex parte Perkins,
 
 851 So.2d 453 (Ala.2002), cert. denied, 540 U.S. 830, 124 S.Ct. 69, 157 L.Ed.2d 55 (2003);
 
 Ex parte Hagood,
 
 777 So.2d 214 (Ala.1999);
 
 Ziegler v. State,
 
 886 So.2d 127 (Ala.Crim.App.2003), cert. denied, 886 So.2d 127 (Ala.), cert. denied, 543 U.S. 863, 125 S.Ct. 194, 160 L.Ed.2d 106 (2004);
 
 Loggins v. State,
 
 771 So.2d 1070 (Ala.Crim.App.1999), aff'd, 771 So.2d 1093 (Ala.2000);
 
 Boyd v. State,
 
 715 So.2d 825 (Ala.Crim.App.1997), aff'd, 715 So.2d 852 (Ala.), cert. denied, 525 U.S. 968, 119 S.Ct. 416, 142 L.Ed.2d 338 (1998);
 
 Dallas v. State,
 
 711 So.2d 1101 (Ala.Crim.App.1997), aff'd, 711 So.2d 1114 (Ala.), cert. denied, 525 U.S. 860, 119 S.Ct. 145, 142 L.Ed.2d 118 (1998);
 
 Trawick v. State,
 
 698 So.2d 151 (Ala.Crim.App.1995), aff'd, 698 So.2d 162 (Ala.), cert. denied, 522 U.S. 1000, 118 S.Ct. 568, 139 L.Ed.2d 408 (1997);
 
 Jenkins v. State,
 
 627 So.2d 1034 (Ala.Crim.App.1992), aff'd, 627 So.2d 1054 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1388, 128 L.Ed.2d 63 (1994).
 

 Based on the foregoing, Lewis’s conviction and sentence of death for the murder of Timothy John Kaye are due to be, and are hereby, affirmed.
 

 AFFIRMED.
 

 BASCHAB, P.J., and McMILLAN, SHAW, and WELCH, JJ., concur.
 

 [1]
 

 . Thus, of the 18 African-American jurors, two were struck for cause and five remained in the pool of potential jurors. It is unclear what happened to the remaining 11 African-American jurors on the jury list and initial strike list.
 

 [1]
 

 . Hargedon testimony as to the exact time varied, mentioning just after midnight at one point, but later stating that they did not leave the Drifters’ Club until 2:00 a.m. or later.
 

 [2]
 

 . On September 20, 2002, this Court affirmed Free's conviction and sentence, by an unpublished memorandum.
 
 Free v. State
 
 (No. CR-01-1158), 868 So.2d 484 (Ala.Crim.App.2002) (table).
 

 [3]
 

 . Thus, of the 18 African-American jurors, two were struck for cause and five remained in the pool of potential jurors. It is unclear what happened to the remaining 11 African-American jurors on the jury list and initial strike list.
 

 [4]
 

 . The record also indicates that this juror had convictions for minor traffic offenses as well, but the stated reason was the misdemeanor conviction for writing a bad check.
 

 [5]
 

 . See, e.g.,
 
 McCray v. State,
 
 738 So.2d 911, 914 (Ala.Crim.App.1998);
 
 Ashley v. State,
 
 651 So.2d 1096, 1101 (Ala.Crim.App.1994);
 
 Andrews v. State,
 
 624 So.2d 1095, 1099 (Ala.Crim.App.1993); Willi
 
 ams v. State,
 
 620 So.2d 82, 86 (Ala.Crim.App.1993);
 
 Roger v. State,
 
 593 So.2d 141, 142 (Ala.Crim.App.1991).
 

 [6]
 

 . This juror was listed as number 34 on State’s Exhibit 3, the jury-information sheet (Supp. C. 31); however, she was listed as number 32 on the master jury list (Supp. C. 38) and the strike list (Supp. C. 35).
 

 [7]
 

 . We note that our decision in this case is distinguishable from the decisions in
 
 Hammond v. State,
 
 776 So.2d 884, 892 (Ala.Crim.App.1998), cert. denied, 776 So.2d 895 (Ala.2000), and
 
 Frazier v. State,
 
 632 So.2d 1002, 1007 (Ala.Crim.App.1993), in which we held that
 
 Tomlin
 
 mandated reversal of a defendant’s conviction when the prosecutor made a reference during trial to the fact that the defendant had previously been convicted of the same crime.
 

 [8]
 

 . The cases cited by Lewis in support of his claim are:
 
 Daubert v. Merrell Dow Pharmaceuticals, Inc.,
 
 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (admissibility of scientific expert testimony);
 
 Kumho Tire Co. v. Carmichael,
 
 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (admissibility of scientific expert testimony)
 
 Idaho v. Wright,
 
 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990) (determining the admissibility/trustworthiness of a child witness's testimony);
 
 Jackson v. Denno,
 
 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964) (threshold determination regarding admissibility of confessions);
 
 Ohio v. Roberts,
 
 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980) (threshold determination regarding admissibility of hearsay statement of unavailable witness);
 
 Lilly v. Virginia, 527
 
 U.S. 116, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999) (recognizing that accomplices confessions inculpating a codefendant do not fall within a firmly rooted exception to the hearsay rule).
 

 [9]
 

 . The record indicates that the trial court later changed its ruling and admitted the toxicology report, but after reviewing our decision in
 
 Mayo v. City of Rainbow City,
 
 642 So.2d 524 (Ala.Crim.App.1994), reversed its ruling and gave a curative instruction to the jury regarding the report. (R. 690, 704-05.)
 

 [10]
 

 . We note that Duncan's death sentence was subsequently set aside, based on the United States Supreme Court's holding in
 
 Roper v. Simmons,
 
 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), prohibiting the execution of individuals who were under 18 years of age at the time the capital offense was committed. See
 
 Duncan v. State,
 
 925 So.2d 245 (Ala.Crim.App.2005).
 

 [11]
 

 . Here, the trial court advised the parties that it would review the requested jury instructions during counsel’s closing arguments.
 

 [12]
 

 . Because
 
 Ring
 
 specifically applies the legal principles set out in
 
 Apprendi
 
 to death-penalty cases, we will couch our discussion of Lewis’s claims in terms of what
 
 Ring
 
 requires, rather than
 
 Apprendi.
 

 [3]
 

 “3Indeed, the only ease we know of successfully challenging execution by lethal injection involved an inmate’s individualized claim that death by lethal injection would violate the Eighth Amendment’s prohibition against cruel and unusual punishment because he suffered from collapsed veins. See
 
 Nelson v. Campbell,
 
 541 U.S. 637 (2004). Bryant makes no such individualized claim. Thus, he is entitled to no relief on his claim that death by lethal injection constitutes cruel and unusual punishment.”
 

 [13]
 

 . See Part XXII of Lewis's brief.